UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

GORDOS RESTAURANT CORP.,

               Debtor.

Chapter 7
Case No. 18-23862 (RDD)

---

MARK S. TULIS, as Chapter 7 Trustee of
Gordos Restaurant Corp.,

               Plaintiff

             -against-

GORDOS NORTH RESTAURANT CORP.,
MICHAEL J. SCHLIMAN, ELIZABETH
SCHLIMAN, and JOANNE PIAZZA,

               Defendants.

Adv. Pro. No. 19-08721 (RDD)

---

## MEMORANDUM OF DECISION AFTER TRIAL

Appearances:

LAMONICA HERBST & MANISCALCO, LLP, by David A. Blansky, Esq. for Plaintiff Mark
S. Tulis, as chapter 7 trustee of Gordos Restaurant Corp.

LAW OFFICES OF FLOREK & COUNSEL LLC, by Stephen A. Florek III, Esq., for Defendant
Gordos North Restaurant Corp.

LAW OFFICES OF SERRANO & ASSOCIATES, P.C., by Roselina Serrano, Esq., for
Defendant Joanne Piazza

Michael Schliman and Elizabeth "Lisa" Schliman, *pro se*

Hon. Robert D. Drain, United States Bankruptcy Judge

       This Memorandum of Decision explains the Court's reasons, after trial, for granting in

part and denying in part the claims of the chapter 7 trustee (the "Trustee") of Gordos Restaurant

Corp. ("Gordos" or the "Debtor") based on the Trustee's allegations that defendant Gordos North

Restaurant Corp. ("Gordos North") wrongfully obtained and is using Gordos' trade name and associated good will; that defendants Joanne Piazza and Lisa Schliman, the co-owners of Gordos North, improperly benefited from such transfer; and that defendant Michael Schliman breached his fiduciary duties as Gordos' president and controlling shareholder in permitting the transfer to occur.

<u>**Jurisdiction**</u>

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a)-(b) and 1334(b). The Trustee's claim to avoid and recover the postpetition transfer of Gordos' trade name and associated goodwill under 11 U.S.C. §§ 549 and 550 arises uniquely under the Bankruptcy Code and is a core proceeding that the Court can decide by a final judgment under 28 U.S.C. § 157(b)(2) and the United States Constitution. *Jones v. Brand* (*In re Belmonte*), 551 B.R. 723, 726 (Bankr. E.D.N.Y. 2016); *Deeba v. Superior Farm, LLC* (*In re Macco Props.*), 2016 Bankr. LEXIS 156, at *13 (Bankr. W.D. Okla. Jan. 14. 2016); *Coan v. MDC Corp.* (*In re Louis Gherlone Excavating, Inc.*), 2014 Bankr. LEXIS 5105, at *2-3 (Bankr. D. Conn. Dec. 19, 2014); *Butler v. Anderson* (*In re C.R. Stone Concrete Contrs. Inc.*), 2013 Bankr. LEXIS 5692, at *34-35 (Bankr. D. Mass. Oct. 15, 2013).

The Trustee's other claims, under sections 43(a) and 43(c) of the Lanham Act, 15 U.S.C. § 1125(a) and (c); under sections 360-1 and 349 of the New York General Business Law; for common law trademark infringement and unjust enrichment; for successor liability based on alter ego or de facto merger theories; and for breach of fiduciary duty are not core proceedings, but, rather, related to this bankruptcy case for purposes of 28 U.S.C. §§ 157(a)-(b)(1) and 1334(b). However, the Trustee and Ms. Piazza separately filed statements consenting to the Court's entry

of a final judgment,[1] and the Schlimans and Gordos North admitted in their answers that this is a

core proceeding, which, in the light of Gordos North and the Schlimans not having complied

with Fed. R. Bankr. P. 7012(b) by having failed to state in their answers or as required by

paragraph 5 of the Court's pre-trial order dated April 12, 2021[2] whether they did or did not

consent to entry of a final judgment by this Court, as well as their acquiescence in the Court's

conduct of the trial, evinces their knowing and voluntary consent to the Court's entry of a final

judgment on all the Trustee's claims. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683-

85 (2015).[3]

### Facts

Between 1972 and February 11, 2019, a "family friendly" bar and grill serving

"American pub food" operated at 415 Commerce Street, Hawthorne, New York under the name

"Gordo's," first as "Gordo's Colonial Tavern" and, since 1981, simply as "Gordo's."[4]  The

original operators and owners, Gordon Krueger and Arthur Greason, sold the restaurant and

related assets, specifically including the trade name "Gordo's," under a Share Purchase

Agreement in October 2006 to Michael Schliman and a business partner.[5]  Mr. Schliman had

worked at the restaurant since 1998 as a bartender, and his wife, Lisa also started working there

soon after the acquisition[6] and was working there when Gordos closed.[7]

---

[1] Adv. Dkt. Nos. 13 and 14.
[2] Id. No. 28.
[3] To the extent necessary, this Memorandum of Decision constitutes the Court's findings of fact and conclusions of law for purposes of 28 U.S.C. § 157(c)(1).
[4] Declaration of Gordon Krueger in Lieu of Direct Examination, dated February 24, 2022 ("Krueger Decl.") ¶¶ 3, 5-7, 14, 52; Ex. R. (transcript of May 24, 2021 deposition of Lisa Schliman ("L. Schliman Depo. Tr.")), at 20, 23-24. The restaurant's street sign, coasters, and menu said "Gordo's."  Exs. K and 7. Other references to the restaurant drop the apostrophe, using "Gordos."
[5] Ex, A-B (Bill of Sale and Share Purchase Agreement, respectively).
[6] Kruger Decl. ¶ 8; L. Schliman Depo. Tr., at 19-20.
[7] March 3, 2022 Trial Transcript ("Trial Tr."), at 27 (testimony of Lisa Schliman).

The original owners retained title to the building when they sold the restaurant, and although they continued to lease it to Gordos on a month-to-month basis after the original lease expired in 2016, the terms for Mr. Schliman's purchase of the building were not implemented and a warrant of eviction was issued on November 26, 2018 that precipitated Gordos' filing under chapter 11 of the Bankruptcy Code on December 5, 2018.[8]

Krueger and the decedent's estate of Mr. Greason moved for an order under 11 U.S.C. § 362(b)(10) declaring that because of the prepetition termination of the lease by the expiration of its stated term (and the issuance of the warrant of eviction), the automatic stay under 11 U.S.C. § 362(a) did not apply to their interest in the premises,[9] and the Court granted that relief.[10] Having continued to operate postpetition through February 11, 2019 on the landlord's conditional consent, on February 12, 2019 Gordos ceased business and turned over the premises to the landlord.[11]

Gordos moved to dismiss its chapter 11 case on February 20, 2019,[12] but after a hearing on March 22, 2019 where the possibility of available assets to administer was credibly raised,[13] the Court entered an order converting the case to one under chapter 7 of the Bankruptcy Code,[14] which, among other things, resulted in the Trustee's appointment.

An on-line article by the *Examiner News* about Gordos' last day noted that Mr. Schliman "said resurrecting the business is not out of the question. He will be looking for new locations, preferably in the Mount Pleasant and Pleasantville area, so it would be easy for many regulars to

---

[8] Krueger Decl. ¶¶ 15, 17-21.
[9] Main Case Dkt. No. 9. *See also* 11 U.S.C. § 541(b)(2).
[10] Main Case Dkt. No. 22.
[11] Krueger Decl., ¶¶ 24, 27; L. Schliman Depo. at 22.
[12] Main Case Dkt. No. 23.
[13] Id. No. 35.
[14] Id. No. 29.

return."[15]  And on February 21, 2019, ten days after Gordos closed and one day after Gordos moved to dismiss its chapter 11 case, Ms. Schliman and Ms. Piazza incorporated Gordos North as 50/50 shareholders under section 402 of the New York Business Corporation Law.[16]  The new corporation was aptly named:  the certificate of incorporation listed its address as 1006 Broadway, Thornwood, NY, which is approximately 1.5 miles, or a five minute drive, due north from Gordos.[17]  That is where Gordos North eventually opened its own family friendly American-style bar and restaurant, under the name "Gordos North" on September 15, 2019,[18] after obtaining a liquor license and completing a buildout/remodeling, under the motto, which appeared on its menu, "A New Dining Experience with Old Friends."[19]

One reasonably infers that, consistent with the statement attributed by the *Examiner News* to Mr. Schliman on Gordos' last day, the Schlimans and the Piazzas were at that time focusing on Gordos North opening nearby.  This is corroborated by Mr. Piazza's testimony that he had been looking for a location for Gordos North in his town, Mount Pleasant. Trial Tr. at 71. (Mount Pleasant, New York includes the hamlets of Hawthorne and Thornwood.)[20]

Both Mr. and Ms. Schliman went to work at the new restaurant full time,[21] as did several of Gordos' former employees, including the cook,[22] and the restaurant's menu included many of Gordos' former dishes.[23]  Neither of the Schlimans had contributed any monetary capital to the

---

[15] Ex. L ("Last Call for Longtime Hawthorne Tavern Marks End of an Era").

[16] Ex. E (Certificate of Incorporation for Gordos North Restaurant Corp.).

[17] Krueger Decl. ¶¶ 32-34; Trial Tr., at 36 (testimony of Lisa Schliman); Trial Tr., at 71 (testimony of John Piazza.).

[18] L. Schliman Depo. Tr., at 40.

[19] Id., at 47-48.

[20] https://www.mtpleasantny.com.

[21] L. Schliman Depo. Tr., at 41-42.  Mr. Schliman stopped working there either in April 2020 with the onset of the covid epidemic, Ex. S (transcript of June 25, 2021 deposition of Michael Schliman ("M. Schliman Depo. Tr.")), at 20-21, 28, or in July 2020, when Mr. Schliman was hospitalized.  L. Schliman Depo. Tr., at 42.

[22] L. Schliman Depo. Tr., at 42-44, 121-24; M. Schliman Depo. Tr., at 30-34.

[23] Krueger Decl. ¶ 52; L. Schliman Depo. Tr., at 120-121; Ex. G (Gordos North menu submitted with New York liquor license application), Ex. H (later Gordos North menu).

new corporation.[24] No payment was offered to the Trustee on behalf of the Debtor's chapter 11

estate for the use of Gordos' name or any associated goodwill.

Apparently the Trustee learned of Gordos North's existence through Mr. Krueger, who

saw online customer reviews of the restaurant starting in November 2019 and articles about it in

the *Lewisboro Daily Voice* and *Westchester Magazine* on November 30, 2019 and December 9,

2019, respectively.[25]  In addition to the facts stated above and, as discussed below, the material

gross income that Gordos North generated from the month that it opened, these two articles and

online reviews are the Trustee's primary evidence that Gordos North is liable for taking without

paying any consideration a valuable trade name and associated goodwill from Gordos.

It is clear from the online reviews and articles comprising Exhibits M, N, P, and Q that

customers and the local press viewed Gordos North as a return of Gordos, albeit with some

design and menu upgrades.  Online comments on Gordos North's Facebook page state, "We are

happy to be back at Gordo's. . . .  Glad they are back!" and "Lisa and Mike always welcome us

with a smile."[26] Online Yelp reviews for Gordos North from September 2019 through November

2019 state, "We had often been to the original Gordos and was [sic] excited to welcome back an

old friend, now Gordos North;" "fast forward through the original Gordos relocating to Town

Center . . . my parents took my brother and I [sic] to THIS Gordo's just last week;" "Lunch was

nice, a great Gordos burger perfectly cooked with Swiss and special mayo, and good fries;" "We

all missed old Gordos and I was to [sic] excited to try Gordos North. Wow! What an upgrade

---

[24] Trial Tr. at 68-69 (testimony of John Piazza); see also Trial Tr. at 31 (testimony of Lisa Schliman), Trial Tr. at 51 (testimony of Michael Schliman), each stating that the funds for the buildout, equipment and operating expenses came from Mr. Piazza or his construction company, Piazza Brothers, Inc.  The provision of those funds to Gordos North was not treated as a loan, there being no documentation of any repayment obligation or other indicia of a loan, and Mr. Piazza having testified that the funds would be repaid "when Gordos North makes money."  Trial Tr., at 68, 72-75 (testimony of John Piazza), 36-37 (testimony of Lisa Schliman).
[25] Krueger Decl, ¶¶ 36-38.
[26] Ex. M.

from the old Gordos;" "Definitely completely updated compared to the previous Gordo's;" "I

have to admit, I was not a frequent patron of Gordos, but when I did go I appreciated the old

town feel, friendly service, good food, and good prices.  Gordos North is much nicer, they did a

good job on the place. . . .  The food was ok.  I actually liked the original Gordos burgers better

than the one I had at North, and for about ½ the price . . . I wish them great success, though I

suspect the fad will fade unlike the original;" "Should update their website as searches bring up

the former Hawthorne location;" "familiar to all that you loved at the original Gordos -- and

more;" and "this is not the old gordo's. first appetizer was to [sic] too salty to eat."[27] The Yelp

page for Gordos North also has the following questions and answers:

Question:  Based on the pictures it seems like is the same quality food but at double the
price -- am I missing something?

Answer:  Not the same menu at all. It's a beautifully designed space that is trending with
a modern atmosphere and the menu reflects the trends. . . . It's still a cozy inviting place to meet
friends or take. . . .

Question: Is it the same owners?  Is Buddy the bartender still there?

Answer:  Same owners joined together with a partner.  Buddy is still there.  The place is
beautiful!"[28]

After noting "Gordo's North is off to a running start after opening its doors in

September," the November 30, 2019 eight paragraph article from the *Lewisboro Daily Voice*

refers in its second paragraph to Gordos North having "moved from its former location in

---

[27] Ex. Q.

[28] Id.  Eleven out of nineteen Yelp reviews, plus the Yelp Questions and Answers, referenced the "old" Gordos.  Mr.
Krueger also testified that "Since the time that Gordos North began operating in its Thornwood location, several
people have confused Gordos North with Gordo's.  For instance, my wife's hairdresser asked her whether Gordo's
reopened at a new location.  At other times truck drivers of suppliers to Gordos North have stopped at the [old
Gordo's location, where Mr. Krueger opened a restaurant called "Unionville Tavern"] . . . attempting to deliver
goods to Gordos North."  Krueger Decl. ¶¶ 39-41.  Although this testimony was admitted without objection, I have
considerably discounted it, however, given Mr. Krueger's clear interest in the outcome as one of the Debtor's major
creditors. *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir. 1988).

Hawthorne" and in its fourth, fifth, and seventh paragraphs refers to the new restaurant simply as "Gordo's."[29]

The title of the December 9, 2019 *Westchester Magazine* article is "This Hawthorne Restaurant Reopened with a Fresh Look in Thornwood."  The first paragraph reads, "Keeping the convivial atmosphere of Hawthorne mainstay Gordo's, which closed in February, Gordos North opened in Thornwood in September, with an updated menu and elevated interior design. As its outdoor signage proclaims, it's 'A new dining experience with old friends.'"  The second paragraph begins, "The new restaurant is owned by Lisa Schliman of the original Gordo's, and Joanne Piazza."[30]

Gordos North's Facebook page picked up on the linkage with Gordos in a post, dated December 9, 2019 stating, "Boom! Fan favorite Gordos North is BACK with a more upscale atmo and some worldly cuisine!" along with a hyperlink to the *Westchester Magazine* article by its "This Hawthorne Restaurant Reopened" title.[31]

It appears that Gordos North's first months were successful, which at least in part can be reasonably attributed to a jump start from its use of Gordo's trade name and goodwill.  Gordos North's adjusted gross sales, after taxes, for the partial month of September 2019 -- the restaurant having opened on September 15, 2019[32] -- were $74,837.38, followed by adjusted gross sales of $129,990.77, $126,188.34, $121,340.11, $90,498.67, and $92,384.48 for October 2019, November 2019, December 2019, January 2020, and February 2020.[33]

---

[29] Ex. N. ("Newly Opened 150-Seat Gordo's North Off to Strong Start in Westchester").
[30] Ex. P.
[31] Ex, O.
[32] See n.18 above.
[33] Exs, J and U (based on Gordos North's  monthly operating reports for September 2019 through January 2022, which fairly and accurately reflect the information in Gordos North's point of sale reporting system, and summary thereof, respectively; L. Schliman Depo. Tr., at 96-96, 99-102; Trial Tr., at 40-41 (testimony of Lisa Schliman)).

With the arrival of the covid epidemic in March 2020, there was a considerable decline in adjusted gross sales, which gradually grew back to $79,993.45 in March 2021 and thereafter ranged between a monthly low of $62,985.80 and a high of  $103,323.31 through January 2022, the last month of the operating reports in evidence,[34] although it appears that, like many restaurants, Gordos North was feeling some "covid effect" during that period, too.

It perhaps should go without saying that a restaurant operating in a small community for over 40 years in the same basic format under the same name has earned local recognition.  In any event, both Ms. Schliman and Mr. Piazza acknowledged that Gordos was a "fixture" in Mt. Pleasant.[35] And as made clear by the online reviews as well as the articles noted above, Gordos had not lost its cachet as a "convivial . . . Hawthorne mainstay"[36] upon its closure.  Equally clear is that Gordos North traded on that goodwill in opening a similar restaurant 1.5 miles north of Gordos, highlighted by its Facebook page entry, quoted above, "Boom! Fan favorite Gordos North is BACK" with a hyperlink to the *Westchester Magazine* article also noted above.  Of course Gordos North, having just opened, was not BACK from anything except the former Gordos.

Ms. Schliman testified that Gordos North's Facebook page was linked to her own Facebook page[37] and that she is the only person who posts on social media for the restaurant, although there also is a company that regulates the social media platforms.[38]  One infers that she at least knew of the "Boom!" post and may well have written it.

---

[34] Id.
[35] Trial Tr., at 69-70 (testimony of John Piazza), 36 (testimony of Lisa Schliman).
[36] See n. 30 above.
[37] Trial Tr., at 40
[38] L. Schliman Depo. Tr., at 130-31.

In the light of the above, therefore, Ms. Schliman's testimony that she and the Piazzas chose the name "Gordos North" as a joke because she and Mr. Piazza each had weight loss surgery and "gordos" means "fat" in Spanish[39] simply was not credible.  Rather, it appears to have been an attempt to fit the square peg of the facts into the round hole of a legal theory premised on there being a "Gordos Cantina" in Brooklyn, New York,[40] other food companies and Spanish-themed restaurants elsewhere in the United States and active trademark registrations (each dated decades after Gordos opened in Hawthorne) with names such as "El Gordo Restaurant" in Passaic, New Jersey, "Hamburguesas Gordos" in Flushing, Queens[41] and "Gordos Cuban Cuisine" in Pensacola, Florida; "Gordo's" canned tomatoes, sour cream, block cheese, cheese dip, and dried beans; and "Gordos Hot Chicken" in Oxnard, California."[42] I find, contrary to Ms. Schliman's testimony, that Gordos North and its owners knew they were appropriating Gordos' trade name and goodwill.

## **Discussion**

A.  Unauthorized Postpetition Transfer.  Section 549(a) of the Bankruptcy Code states that, subject to exceptions inapplicable here, "[T]he trustee may avoid a transfer of property of the estate -- (1) that occurs after the commencement of the case; and (2) . . . (B) that is not authorized under this title or by the court."[43]  The section contemplates the avoidance of involuntary transfers or appropriations of estate property as well as unauthorized voluntary transfers: by its plain terms the Bankruptcy Code's definition of "transfer" includes "each mode,

---

[39] Trial Tr. at 27-28 (testimony of Lisa Schliman).
[40] Trial Tr., at 28 (testimony of Lisa Schliman), 44, 49, 54 (testimony of Michael Schliman).
[41] Ex. 3 (nationwide Google search results for "Gordos").
[42] Ex. 4 (United States Patent and Trademark Office ("USPTO") indices of trademark applications and registrations for "Gordos").
[43] 11 U.S.C. § 549(a).

direct or indirect, absolute or conditional, voluntary *or involuntary*, of disposing of *or parting with* -- (i) property; or (ii) an interest in property."[44]

Bankruptcy Rule 6001 provides that "Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof."[45]  Some courts, although apparently none in the Second Circuit, have held that this Rule is subject to two possible interpretations:  (1) the defendant has the burden on all elements of the claim and any defense, or (2) focusing on the Rule's reference to the "validity" of the postpetition transfer, the defendant has the burden of proving only that the transfer was authorized, such as by showing that it was not out of the ordinary course and therefore not subject to section 363(b) of the Bankruptcy Code[46] or that it fell within one of the Bankruptcy Code's express exceptions to avoidance under section 549. *Sender v. Love Funeral Home* (*In re Potter*), 386 B.R. 306, 309 (Bankr. D. Colo. 2008).

*Sender* adopted the latter interpretation, which appears to be the majority's.  *Id.* at 310, and the cases cited therein; *see also Fursman v. Ulrich* (*In re First Prot., Inc.*) 440 B.R. 821, 828 (BAP 9th Cir. 2010) (trustee must prove prima facie case); *Abbott v. Arch Wood Prot., Inc.* (*In re Wood Treaters, LLC*), 491 B.R. 591, 596 (Bankr. M.D. Fla. 2013) (under Rule 6001 "the trustee must first show that a post-petition transfer of estate property has occurred, and the ultimate burden then shifts to the defendant to show the validity of the transfer"); *In re O'Brien*, 443 B.R. 117, 135 (Bankr. W.D. Mich. 2011) ("To determine whether a postpetition transfer is avoidable, a trustee must establish that a 'transfer' occurred, § 101(54), and that the transfer involved property of the estate, § 541.  A trustee has the presumption that the transfer was not authorized by the Bankruptcy Code or court; the transferee must establish authorization of a debtor's

---

[44] 11 U.S.C. § 101(54)(D) (emphasis added).
[45] Fed. R. Bankr. P. 6001.
[46] 11 U.S.C. § 363(b)(1), which states in relevant part, "The trustee, *after notice and a hearing*, may use, sell, or lease, other than in the ordinary course of business, property of the estate." (Emphasis added.)

transfer of the property.  Fed. R. Bankr. P. 6001.").  *But see Scheiffler v. Coleman* (*In re Beshears*), 196 B.R. 464, 466 (Bankr. E.D. Ark. 1996); 5 Collier on Bankruptcy ¶ 549.01 (16th ed. 2022) ("Section 549 must be read in conjunction with Federal Rule of Bankruptcy Procedure 6001, which places the burden of proof on the entity seeking to uphold a transfer challenged under section 549.").[47]

The Court agrees with the approach taken by *Sender*, *First Prot.*, *Wood Treaters*, and *O'Brien*:  the better interpretation of Rule 6001 is that, to encourage parties to seek advance court authorization of postpetition transfers, the drafters put the onus on transferees to show such authorization was not required.  The burden of proving section 549's elements of a (1) postpetition (2) transfer (3) of property of the debtor's estate, however, is on the trustee.

Here, the Trustee has established that, if Gordos' trade name and associated goodwill was property of the Debtor's estate at the commencement of the bankruptcy case, it was transferred postpetition to Gordos North,[48] and Gordos North has not attempted to show that the transfer did not require Court authorization under section 363(b) of the Bankruptcy Code or was otherwise authorized by the Bankruptcy Code.  Nor, if it had tried to do so, could Gordos North have carried its burden of proof as to the validity of the transfer, because the transfer of the Debtor's trade name would clearly have been out of the ordinary course, requiring notice and prior Court approval, while there was in fact no such notice or approval and Gordos North paid nothing for the transfer.

---

[47] Collier cites, however, *In re First Prot., Inc.*, 440 B.R. at 821, which, as noted above, places at least the burden of making a prima facie case on the plaintiff trustee. *Id.*

[48] Gordos' bankruptcy petition date was December 5, 2018. The transfer could be said to have occurred at the earliest when Gordos North was incorporated on February 21, 2019, with the intention of opening a restaurant in Mt. Pleasant under that name and at the latest when Gordos North opened for dining on September 15, 2019, in each case when Gordos' bankruptcy case was pending.

The only open issue under section 549, then, is whether "Gordo's" and its associated goodwill was property of the Debtor's estate when it was appropriated postpetition by Gordos North.

The Bankruptcy Code defines "property of the estate" broadly. Subject to exceptions not applicable here, the bankruptcy estate "is comprised of all of the following property, wherever located and by whomever held: (1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case."[49] Whether something is "property of the estate" is a federal question, but federal law looks to applicable state law to determine whether the debtor has an interest in the property at issue except where a federal interest, including an express exception under the Bankruptcy Code, requires a different result. *Butner v. United States*, 440 U.S. 48, 54-55 (1979); *In re Morton*, 866 F.2d 561, 563-64 (2d Cir. 1989).

Courts have no difficulty finding that "property of the estate" encompasses intangible property interests such as trademarks and trade names and associated goodwill. *See, e.g.*, *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 874 (E.D.N.Y. 1978) ("[U]pon the bankruptcy of the trademark owner, the trademark together with the goodwill it symbolizes becomes vested in the Trustee in Bankruptcy, and may be sold by him as an asset of the estate. It follows, therefore, that the goodwill of the insolvent's mark is not automatically destroyed upon his adjudication of bankruptcy.") (citations omitted); *John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d 90, 95 (D. D.C. 2010) ("There is no reason to believe . . . that a company's priority of ownership over its trademark ceases merely because a company goes bankrupt. The company's trademark and associated goodwill are valuable assets that become part of the bankruptcy estate and can be validly sold, assigned, or transferred by the estate."), *aff'd in part*

---

[49] 11 U.S.C. § 541(a)(1).

*and remanded on other grands in part*, 642 F.3d 1105 (D.C. Cir. 2011); *Phillips v. Diecast Marketing Innovations, L.L.C.* (*In re Collecting Concepts*), 2000 Bankr. LEXIS 615, at *8-9 (Bankr. E.D. Va., Feb. 28, 2000) (corporate name is property of the estate); *In re Gucci*, 202 B.R. 686, 690 (Bankr. S.D.N.Y. 1996) (trade name and trademarks are property of the estate); *In re Golden Plan of California, Inc.*, 37 B.R. 167, 169-170 (Bankr. E.D. Cal. 1984) (corporate name is property of the estate).

Numerous courts also have determined that the transfer of trademarks and trade names and their associated goodwill can be avoided under the Bankruptcy Code's avoidance provisions as transfers of property of the debtor's estate (or, for fraudulent transfer purposes, of assets that would have been property of the estate if not transferred prepetition). *See, e.g.*, *Kaliner v. DMW Marine, LLC (DE)* (*In re DMW Marine, LLC*), 2014 Bankr. LEXIS 2958, at *10-11, *14-15 (Bankr. E.D. Pa, Jul. 10, 2014) (involuntary transfer of intellectual property, including trade name and domain name, is avoidable); *West v. Hsu* (*In re Advanced Modular Power Sys.*), 413 B.R. 643, 667-68, 670-71 (Bankr. S.D. Tex. 2009), *aff'd, Hsu v. West*, 2009 U.S. Dist. LEXIS 126483 (S.D. Tex. Dec. 30, 2009) (goodwill, including trade name, is property of debtor's estate under Texas law; transfer avoidable); *Schott v. McLear* (*In re Larry Koenig & Assoc., LLC*), 2004 Bankr. LEXIS 2311, at *19-21, 24 (Bankr. W.D. La. Mar. 31, 2004) (trade name and domain name is property of debtor's estate under Louisiana's and California's broad definition of "property;" transfer avoidable).

The foregoing courts do not confine their analysis of whether trade names or trademarks are "property of the estate" to whether they are entitled to protection under the Lanham Act or comparable state laws regarding trademark infringement and unfair competition. For example, *In re DMW Marine, LLC* first found an avoidable transfer of intellectual property, including of

14

the debtor's trade name, and then separately analyzed whether the trustee also had a claim under the Lanham Act and similar Pennsylvania law, eventually concluding that the trustee did not. 2014 Bankr. LEXIS at *15-20.  *In re Larry Koenig & Assoc., LLC* relied on Louisiana Civil Code article 477(A), which defined "ownership" as "the right that confers on a person direct, immediate and exclusive authority over a thing." 2004 Bankr. LEXIS 2311, at *20.  Similarly, *Argyle Online, LLC v. Nielson* (*In re GGW Brands, LLC*), 504 B.R. 577, 626 (Bankr. C.D. Cal. 2013), found that trademarks were property of the debtor's estate for avoidance purposes because Cal. Civil Code § 655 states that "There may be ownership of all inanimate things which are capable of appropriation or of manual delivery, of all domestic animals, of all obligations, of such products of labor or skill as the composition of an author, the goodwill of a business, trademarks and signs, and of rights created or granted by statute."

New York has long recognized, as an element of the common law claim of misappropriation, a property right in the goodwill of a business, used interchangeably with the term "commercial advantage," which can include a business' name if that name reflects the owner's skill, expenditures and labor.  *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 477-79 (2007); *City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233, 240 (S.D.N.Y. 2010) ("In order to establish a protectible right to a trade name under New York law, the [plaintiff] must . . . show that the defendants are unfairly attempting to exploit the efforts of another to create goodwill in that trade name.").[50]

Or one may apply the definition of "property" in Black's Law Dictionary (11th ed. 2019): "the rights in a valued resource . . . These rights include the right to possess and use, the right to

---

[50] *See also Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) ("A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes."); *Nipon v. Leslie Fay Cos.* (*In re Leslie Fay Cos.*), 216 B.R. 117, 124 (Bankr. S.D.N.Y. 1997) ("The sale of a trademark includes the sale of the mark along with the goodwill and tangible business assets that go along with the trademark. . . .").

exclude, and the right to transfer."  Or, recognizing the purpose of section 549 of the Bankruptcy

Code to prevent the transfer without notice, the opportunity for a hearing, and court authorization

of assets that may be used to pay creditors, 5 Collier on Bankruptcy ¶ 549.02, the definition

could be further simplified to anything that might derive value for the debtor's estate. *See also*

*Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996) ("Property is generally understood to

include anything of value."). On the other hand, too broad a reading of "property of the estate"

could conceivably encompass the Brooklyn Bridge or any other worthless item for which fools

might be persuaded to pay.

As noted above, the trade name "Gordo's" and the goodwill associated with it were

expressly sold as part of the 2006 Share Purchase Agreement.[51]  Further, Mr. Schliman testified

that he understood that this conferred permission from the prior owners to use the name.[52]  Based

on these facts and the benefit that Gordos North derived from trading off of Gordos' name and

goodwill, it is clear that it obtained property of the Debtor's estate, not the equivalent of the

Brooklyn Bridge, without authorization for purposes of section 549 of the Bankruptcy Code.  As

discussed below, moreover, even under a narrower definition of "property of the estate" that

equates the Debtor's interest in Gordos' trade name with its right to a claim for misappropriation

under section 43(a) of the Lanham Act and similar New York common law, Gordos North

obtained property of the estate when it appropriated the name and associated goodwill.

Thus the transfer should be avoided under section 549 of the Bankruptcy Code.

As a consequence, the Trustee may recover under section 550 of the Bankruptcy Code,

for the benefit of the estate, the property transferred or, if the Court so orders, the value of such

property from, among others, the initial transferee of such transfer or any entity for whose

---

[51] See n. 5, above.
[52] Trial Tr., at 46.

benefit such transfer was made.[53]  Because consideration of the appropriate remedy under section

550 largely ties in to the Trustee's claims under the Lanham Act, however, it will not be

addressed until after the following analysis of the Trustee's misappropriation claims under the

Lanham Act and similar New York law.

     B. <u>Claim under Section 43(a) of the Lanham Act</u>.  As a preliminary matter, while the

parties have referred to "Gordo's" as a trademark, it is more appropriately viewed as a trade

name for purposes of the Lanham Act and similar New York law.  Judge Garrity summarized the

distinction in *In re Ditech Hldg. Corp.*, 2020 Bankr. LEXIS 1840, at *22-23 (Bankr. S.D.N.Y.

Jul. 9, 2020):

> A trade name is entitled to protection if it identifies a person's 'business or
> vocation.' See 15 U.S.C. § 1127.  In that way, a trade name is a name, phrase or
> symbol that is used to identify and distinguish the business itself from other
> entities rather than distinguishing the goods or services the company provides. . . .
> In contrast to trade-names, trademarks identify products.  A trademark is 'any
> word, name, symbol, or device, or any combination thereof . . . used by a person .
> . . to identify and distinguish his or her goods, including a unique product, from
> those manufactured or sold by others and to indicate the source of the goods, even
> if that source is unknown.' 15 U.S.C. § 1127.

(internal case quotation marks and citations omitted).

     Notwithstanding that distinction, however, trade names and trademarks are equally protected

under section 43(a) of the Lanham Act, which states, in relevant part,

   (a) Civil action.
     (1) Any person who, on or in connection with any goods or services . . . uses in
        commerce any word, term, name, symbol, or any combination thereof, or any
        false designation of origin, false or misleading description of fact, or false or
        misleading representation of fact, which --
        (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
           affiliation, connection, or association of such person with another person,
           or as to the origin, sponsorship, or approval of his or her goods, services,
           or commercial activities by another person, or

---

[53] 11 U.S.C. § 550(a)(1).

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities;

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.[54]

*See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 976, 578 (2d Cir. 1991) (applying same standards to trade names and trademarks under section 43(a) of the Lanham Act); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534-35 (9th Cir. 1989) (trade names and trademarks protectable under same standards); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1345 (E.D.N.Y. 1994); 1 McCarthy on Trademarks and Unfair Competition §§ 4.5 n.10, 9.1, 9.2 (5th ed. 2022) (trade names, including pure trade names that are not capable of federal registration, are protectable under the same principles as trademarks under the Lanham Act); 1 Gilson on Trademarks § 2.10[2]-[3] (2022) ("Trade names are generally protectable under the same general principles that apply to trademarks, except that they are not registrable with the USPTO.  Protection for trade names is ordinarily available under (1) state unfair competition law, either common law or statute, [and] (2) Section 43(a) of the Lanham Act. . . . Just as they benefit from the law applying to trademarks, so too are trade names subject to the same general requirements for protection.").[55]

For the Trustee to have a claim under section 43(a) of the Lanham Act, he must meet a two-part test:  (1) was "Gordo's" "a valid mark that is entitled to protection" and (2) were Gordos North's actions "likely to cause confusion with that mark." *Tiffany & Co. v. Costco*

---

[54] 15 U.S.C. § 1125(a).

[55] Trade names also can be trademarks, as the two often functionally overlap, *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d at 1534, and in that capacity can be registered. *Martahus v. Video Duplication Servs.*, 3 F.3d 417, 421 (Fed. App. 1993).  "Nevertheless, a trade name lacking any independent trademark or service mark significance may bar [later] registration of a trademark or service mark that is confusingly similar to that trade name." *Martahus*, 3 F.3d at 422; *see also City of New York v. Tavern on the Green,* 427 B.R. at 241-43; 1 Gilson on Trademarks § 2.10[2] ("Trademark use does not trump [prior] trade name use.").

*Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020); *LVL XIII Brands, Inc. v. Louis Vuitton SA*, 720 Fed. Appx. 24, 25 (2d Cir. 2017).

As for the first prong, because "Gordo's" was not registered with the USPTO it is not presumptively entitled to protection, but it nonetheless is entitled to protection if the Trustee shows it to be sufficiently distinctive. *Hello I Am Elliot, Inc. v. Sine*, 2020 U.S. Dist. LEXIS 116681, at *16-17 (S.D.N.Y., Jul. 2, 2020). Courts still use the "distinctiveness" categories for unregistered marks listed in *Abercrombie & Fitch Co. v. Hunting World Inc.*, 537 F.2d 4, 9 (2d Cir. 1976): whether the mark is generic, descriptive, suggestive, or arbitrary or fanciful. *Id.* at *17. The latter three categories are "inherently distinctive" and thus readily qualify for protection under the Lanham Act. *Id. See also United States PTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020).[56] Generic names or terms are at the lowest end of the distinctiveness scale, although whether a term is "generic" is not always obvious, turning on "whether that term, taken as a whole, signifies to consumers the type of class of services or goods offered or, instead, a particular provider of such goods or services," the latter being protected. *Id*. at 2303-05.

"Descriptive" marks "are protectable only if they are shown to have acquired secondary meaning to consumers." *Hello I am Elliot*, 2020 U.S. Dist. LEXIS 116681, at *17 (internal quotation marks omitted). Generally, personal names, whether first names or surnames, are viewed as "descriptive" marks requiring a showing of acquired secondary meaning. *Id*. at *18. While there is some disagreement as to the inherent weakness of personal names to indicate the source of goods or services with which they are associated, especially if the name is not common or not viewed by the public in context as a personal name, 1 Gilson on Trademarks, §

---

[56] A term is "suggestive" "if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Bristol-Myers Squibb Co. v. McNeil-P.P.C.*, 973 F.2d 1033, 1040 (2d Cir. 1992) (internal quotation marks and citation omitted). "A term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." *Id.* (internal quotation marks and citation omitted).

2.03[4][d]Iii][B] and [C], and it is not readily apparent that they fit in the general rubric of

descriptiveness, as opposed to suggestiveness, in that they neither describe the product or its

purpose or utility,[57] it has been held that a personal name is "descriptive" even if the mark does

not refer to an actual person, *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d at 649, or

the alleged infringer is not itself associated with someone who has the same or a similar name.

*Yarmouth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987) ("While a senior user

of a personal name historically might have a certain equitable priority in using his legal name as

against a junior user who does not legally bear that name . . . today proof of secondary meaning

is required before a senior user's name is entitled to Lanham Act protection.") (internal citations

omitted).[58]

  "Nevertheless, even a common name mark may warrant protection as a strong mark if it

has achieved distinctiveness in the marketplace," *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360

F.3d 125, 132 (2d Cir. 2004), that is, if it has developed a secondary meaning identifying the

product, or (if a trade name) a business, to originate from a single source.  *Id.* at 131; *see also*

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d at 1040 (secondary meaning attaches

to a mark when "the consuming public primarily associates the term with a particular source");

*Yarmouth Dion*, 835 F.2d at 993 ("A mark or trade name has acquired secondary meaning if a

purchaser will associate it with a certain producer, and will be likely to make that same

association when an identical mark (or a confusingly similar mark), is used on another

producer's product.").

---

[57] See n.56 above.
[58] *But see Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 456-57 (2d Cir. 2013) (denying fair use defense by one who used "Guggenheim" name when it was not his name).

Of key importance is "the distinctiveness in the *relevant* market, for if the mark is not recognized by the relevant consumer group, a similar mark will not deceive those consumers . . . ."  *Brennan's*, 360 F.3d at 132 (emphasis in original) (restaurant's name that had strong secondary meaning in New Orleans lacked secondary meaning in relevant market, New York City); *Morningside Grp., Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999) ("Importantly, a mark's strength is examined principally in the market in which the mark is used.  Hence defining the relevant market becomes an important aspect of the infringement analysis.").  *See also J.T. Colby & Co. v. Apple Inc.*, 2013 U.S. Dist. LEXIS 65959, at *29 (S.D.N.Y., May 8, 2013) ("In determining whether a mark has acquired secondary meaning, the focus must be on the relevant group of consumers, which are those who would ordinarily consider purchasing the plaintiff's product. *Centaur Commc'ns,, Ltd. v. A/S/M/ Commc'ns Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1982); *Lane Capital Mgm't* [*v. Lane Capital Mgt.*], 192 F.3d [337], 345 [(2d Cir. 1999)] ('[T]he relevant purchasing public is not the population at large, but prospective purchasers of the product.')"), *aff'd* 586 Fed. Appx. 8 (2d Cir. 2014).

"In analyzing [whether a plaintiff has met its burden to show] secondary meaning, courts generally consider at least six factors: (1) the senior user's advertising and promotional expenses, (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue."  *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 441 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).  Courts often state that "[t]o prove secondary meaning, a plaintiff must satisfy a 'heavy burden' and 'rigorous evidentiary requirements.'" *Shear Contrs., Inc. v. Shear Enters. & Gen. Contr.*, 2010 U.S. Dist. LEXIS 122173, at *6 (N.D.N.Y., Nov. 16, 2010) (internal quotation marks and citation omitted).

21

In many of these cases, however, including seminal ones, the plaintiff offered little to no tangible

evidence of acquired secondary meaning, *see 20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*,

815 F.2d 8, 10 (2d Cir. 1987) (no evidence from customers, minimal other evidence, no

intentional copying); *815 Tonawanda St. Corp. v. Fay's Drug Co.* 842 F.2d at 648 (no evidence

from customers; evidence largely consisted of plaintiff's self-serving opinion plus a few items of

misdirected mail); *Shear Contrs.*, 2010 U.S. Dist. LEXIS 122173, at *6 (plaintiff "offers only

conclusory statements and generalities"). More importantly, courts also recognize that "[n]one of

these elements is determinative and not every one of them must be proved to make a showing of

secondary meaning," *GeigTech E. Bay, LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 282

(S.D.N.Y. 2018) (internal quotation marks and citation omitted), and the Second Circuit has also

stated, "[T]here is no fixed rule for the amount of proof necessary to prove secondary meaning. .

. ." *Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 1070 (2d Cir. 1995).  Generally,

after noting the plaintiff's "heavy burden" the courts carefully weigh the above and other

relevant factors in the context of the particular customers/market at issue.  *See, e.g., J.T. Colby &

Co. v. Apple Inc.*, 2013 U.S. Dist. LEXIS 65959, at *28-46; *Hamptons Locations, Inc. v. Rubens*,

640 F. Supp. 2d 208, 216-18 (E.D.N.Y. 2009), *aff'd* 364 Fed. Appx. 685 (2d Cir. 2010).

　　Here, the relevant market for determining "Gordo's'" secondary meaning is customers of

restaurants and bars in the immediate area in and around Mt. Pleasant, New York, indeed for

*American family-style restaurants and bars* in that area, Gordos being the type of neighborhood

establishment that one would normally spend no more than twenty minutes traveling to and

Gordos North being about a five-minute drive due north from it.

　　There is unrefuted evidence that Gordos was an institution in its market, having operated

successfully as "Gordo's" in the same location for over forty years, approximately fourteen

under Mr. Schliman's ownership.  The Trustee also established that, while there are restaurants

in other parts of the country with the word "Gordos" in their name, usually with some form of

descriptor identifying its cuisine as Mexican or Cuban, the closest of these to Gordos, until the

opening of Gordos North 1.5 miles away, was a Mexican restaurant in Brooklyn.[59]  Brooklyn

simply is well outside of Gordos' ambit, as confirmed by Ms. Schliman's quote in the

*Westchester Magazine* article noted above:  "People [now] don't have to drive to Armonk or

White Plains to spend a nice evening out."[60] Thus, in the relevant market, Gordos used its trade

name for a long time, with the exception of Mr. Krueger's other "Gordo's" restaurant in

Cortlandt,[61] for about 40 years, and exclusively since 2006.[62]

Moreover, while the Trustee did not submit evidence regarding Gordos' advertising

expenses (only pictures of coasters and the outdoor sign, each emblazoned with "Gordo's"),

experts' consumer studies, or Gordos' income, he did establish with credible evidence through

the on-line reviews and unsolicited articles noted above that Gordos North's customers thought

of the new restaurant as a revival or extension of Gordos.  In addition to Gordos' 40-year record

of success, the Trustee also established that Mr. Schliman and his business partner paid $560,000

---

[59] Paragraph 24(c) and the last exhibit to the 2006 Share Purchase Agreement (Ex. B) contain an exception to the former owners'/sellers' covenant not to compete with Gordos in restaurants in Westchester County, New York that would permit them to operate for no more than one year a restaurant formerly known as Gordo's Grill in Cortlandt, New York if the current owner of the restaurant located there defaulted on its obligations to them; provided, that the Cortlandt premises would be promptly remarketed for sale.  Mr. Krueger credibly testified that Gordo's Grill in Cortlandt, which he once owned, had closed before the 2006 sale of Gordos. Trial Tr. at 23-24. In any event, this provision of the Share Purchase Agreement highlights the care that Mr. Schliman and his business partner took to ensure that Gordos' name would not be further used in Westchester County.

[60] Ex. P.

[61] See n. 59 above.

[62] Contrary to Gordos North's contention that the existence of restaurants and businesses in other parts of the country, and their registration with the USPTO long after Gordos' prior use, vitiates Gordos' trade name, "[T]he owner of a mark is not required to police every conceivably related use thereby needlessly reducing non-competing commercial activity and encouraging litigation in order to protect a definable area of primary importance" *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 272 (S.D.N.Y. 2006) (quoting *Playboy Enter. Inc. v. Chuckleberry Pub., Inc.*, 486 F. Supp. 414, 422-23 (S.D.N.Y. 1980)), *aff'd* 247 Fed. Appx. 232 (2d Cir. 2007).

in 2006 to purchase the former owners' shares in Gordos,[63] and because they did not buy the

building or the lease of the parking lot and they had to obtain their own liquor license,[64] it is

reasonable to infer that they paid $560,000 in large part for the goodwill inherent in Gordos'

name, the only other assets coming along with the shares being the opportunity to lease the

premises, restaurant equipment, and supplies on hand.

Finally, notwithstanding Ms. Schliman's protestations to the contrary, which the Court

did not find credible, Gordos North intentionally appropriated Gordos' name to benefit from its

associated goodwill, as evidenced by its "Boom!" Facebook page entry and its motto, as well as

perhaps the most obvious point: Gordos North in its very name highlighted that it is located just

slightly north of Gordos.  *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 815 F.2d at 10 (that

defendant intentionally copied plaintiff's mark could be persuasive, if not conclusive, evidence

of consumer recognition and goodwill); *New York City Triathlon, LLC v. NYC Triathlon Club,

Inc.*, 704 F. Supp. 2d 305, 330 (S.D.N.Y. 2010) ("intentional copying is persuasive evidence of

secondary meaning"); 1 Gilson on Trademarks § 2.06[8][g] (proof that the defendant intended to

trade on the plaintiff's goodwill by adopting the allegedly infringing terms may be given

substantial weight to prove secondary meaning).

In the light of all the above, the Trustee has established the first prong of his claim under

section 43(a) of the Lanham Act:  the name "Gordo's" was identified with Gordos in the relevant

market of customers of Gordos North, having sufficiently distinctive secondary meaning in that

market to warrant protection.

To evaluate the second prong of section 43(a)'s test for liability, whether Gordos North's

use of Gordos' trade name was likely to cause confusion with "Gordo's," courts use the test

---

[63] Ex. B-C.
[64] Id.

24

articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), "which balances the following eight factors: (1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will 'bridge the gap' by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d at 84-85. However, "[t]he evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* at 85 (internal quotation marks and citation omitted).

It should be noted first that "Gordo's" and "Gordos North" are similar, the dominant element being "Gordos" and the apostrophe not being material. *In re Chatam Int'l*, 380 F.3d 1340, 1344 (Fed. Cir. 2004) ("[T]he dominant feature of [defendant's] mark, GASPA, is also the dominant feature of the registered mark, GASPAR's, albeit in the possessive form. Thus, the Board correctly perceived GASPA and GASPAR's convey a similar appearance, sound, connotation, and commercial impression.").

The evidence with respect to several of the *Polaroid* factors overlaps in large measure with the evidence previously considered in determining whether "Gordo's" had acquired secondary meaning. Gordos' trade name had strong prior secondary meaning in the relevant market, the name "Gordos North" is closely similar to "Gordo's" in that market, and the two restaurants were not only located close to each other but also Gordos North sought to create the

same neighborhood atmosphere serving the same basic type of food and drink.  There were

multiple instances of customer confusion,[65] and that evidence also showed that Gordos North

appealed to the same type of customer, who rather naturally linked the two restaurants. Indeed,

analysis of the possibility of "bridging the gap" is irrelevant because there was little to no gap

between the restaurants.  The Court has also found that Gordos North actually intended to trade

on Gordos' goodwill, and in so doing acted in bad faith. *Tiffany & Co. v. Costco Wholesale

Corp.*, 971 F.3d. at 88 ("In analyzing whether a defendant has acted in bad faith, the question is

whether the defendant attempted to exploit the good will and reputation of a senior user by

adopting the mark with the intent to sow confusion between the two companies' products.")

(internal quotation marks and citation omitted).[66] *See also Paddington Corp. v. Attiki Imps. &

Distribs.*, 996 F.2d 577, 586 (2d Cir. 1993) ("Where a second-comer acts in bad faith and

intentionally copies a trademark or trade dress, a presumption arises that the copier has

succeeded in causing confusion.").

These facts therefore distinguish the present case from *Brennan's, Inc. v. Brennan's

Rest., L.L.C.*, 360 F.3d at 125; *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.* 317 F.3d 209 (2d Cir.

2003); and *Khan v. Addy's BBQ, Inc.*, 419 F. Supp. 3d 538 (E.D.N.Y. 2019), three cases in

which the court declined to find liability under section 43(a) of the Lanham Act for the use of a

restaurant's name.  In *Brennan's*, although both restaurants had close market proximity in the

---

[65] Because it is difficult to find evidence of actual confusion because many instances are unreported, evidence of actual confusion may be quite probative of the likelihood of confusion. *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 291 (3d Cir. 2001); *see also Playnation Play Sys. v. Velex Corp.*, 924 F.3d 1159, 1167 (11th Cir. 2019) ("It is undisputed that evidence of actual confusion is the best evidence of the likelihood of confusion.") (internal quotation marks and citation omitted); 1 <u>Gilson on Trademarks</u> § 2A.05[6] ("Evidence of actual confusion is particularly persuasive proof that confusion is likely"); 5 <u>Gilson on Trademarks</u> § 5.04[1] ("Courts have often emphasized the strong influence of actual confusion evidence on their likelihood of confusion determinations, often calling this factor the most important of all.").

[66] To be clear, the Court has not reached this conclusion based on the mere similarity of the trade names nor inferred bad faith based just on Gordos North's principals' prior knowledge of Gordos' trade  name. *Id.*; *Lang v. Retirement Living Publ'g Co.*, 949 F.2d at 583-84.

sense that they were upscale, the plaintiff's New Orleans restaurant had not acquired

distinctiveness in Manhattan, the defendant restaurant's location, and therefore its mark was

weak, 360 F.3d at 133-35.[67] In addition, the defendant's mark added "Terrance," a well-known

chef in New York, to the name "Brennan's," *id*. at 133, and the defendant's good faith was

shown by its principal's instruction to always use the name including "Terrance." *Id.* at 134.

Here, in contrast, the two restaurants were located very close to each other, and, in that context,

the "North" in Gordos North did not so much distinguish the restaurant from Gordos as indicate

that Gordos was back, just a little to the north of where it had previously been, and the intention

to do so is clear.

In *Patsy's*, the two restaurants were both located in New York City, having operated from

1933 and 1944, respectively, 317 F.3d at 212-13, but the older one had tolerated the junior user's

competition since 1944, warranting denial based on laches of its Lanham Act "bridge the gap"

claim for the junior restaurant owner's prior use of "Patsy's" in connection with bottled sauces.

*Id.* at 212-12, 216-17.

In *Addy's BBQ*, the restaurants at issue were not in close proximity; the defendants' was

in Elmont, Queens and the plaintiff's two restaurants were in Astoria, New York "across almost

the entire borough of Queens," and in Teaneck, New Jersey, approximately twenty-five miles

away." 419 F. Supp. 3d at 555 n. 11. There also was no evidence of actual customer confusion

or of defendant's bad faith: "[i]ndeed, defendants present[ed] evidence indicating that plaintiff

led them to believe that there was no impediment to their continued use of the name 'Addy's

BBQ' in their operation of the Elmont restaurant after he left the partnership." *Id*. at 556.

---

[67] "In the restaurant industry, especially where individual restaurants rather than chains are competing, physical separation seems particularly significant to the inquiry of consumer confusion." *Id*. at 134.

The Trustee thus also has shown a likelihood of customer confusion and therefore has established Gordos North's liability under section 43(a) of the Lanham Act.

For the same reasons, the Trustee has established his claim against Gordo's North for infringement under New York's common law, although this would not entitle the Debtor's estate to any additional recovery than that for breach of section 43(a) of the Lanham Act. Generally, the elements of such a common law cause of action mirror the requirements of section 43(a). *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 372 (S.D.N.Y. 2018); *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 541 (S.D.N.Y. 2012). Additionally, the cause of action requires a showing of bad faith or intent, *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 522 (S.D.N.Y. 2019); *C=Hldgs B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 244 (S.D.N.Y. 2013), but the Trustee has made such a showing based on Gordos North's principals' knowledge of Gordos' senior tradename and the Court's finding that they meant to appropriate Gordos' goodwill by using that name. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 389 (2d Cir. 2005), *cert. denied*, 547 U.S. 1019 (2006); *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d at 587; *C=Hldgs. B.V.*, 992 F. Supp. 2d at 244.

C. Claim under Section 43(c) of the Lanham Act. Based on the same facts, the Trustee also seeks relief under section 43(c) of the Lanham Act for alleged trademark dilution. Because "Gordo's" is a trade name, not a trademark, by its plain terms section 43(c), which protects "the owner of a famous *mark* that is distinctive, inherently or through acquired distinctiveness . . . against another person, who at any time after the owner's *mark* has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution

28

by tarnishment of the famous *mark*"[68] (emphasis added), does not appear to apply to it.  In any event, "Gordo's" is not a "famous mark" for purposes of the statute, which states that "a mark is famous if it is widely recognized by the general public of the United States."[69] Thus, "The geographic reach of the mark must be nationwide for the mark to be found famous under federal dilution law." 2 Gilson on Trademarks, § 5A.01[4][c][ii][C]; *see also id.* § 5A.01[4][c][iii] ("When the Trademark Dilution Revision Act of 2006 amended federal dilution law to require widespread recognition of the mark in the United States, it eliminated protection for trademarks with only 'niche' fame.").

Nor is "Gordo's" sufficiently distinctive to warrant protection under section 43(c), which, in contrast to section 43(a), protects only owners, not also consumers, by permitting them to enjoin junior uses throughout commerce regardless of the absence of competition or confusion. *Tcpip Hldg. Co. v. Haar Communs. Inc.*, 244 F.3d 88, 97-99 (2d Cir. 2001), abrogated by statute on other grounds.[70] For purposes of section 43(c), "A distinctive trademark designates a particular source of products, and the more it retains that source significance beyond the goods and services it is used on, the more distinctive it is.  Would prospective purchasers think of the product bearing the mark if they saw the same mark on *unrelated* products?" 2 Gilson on Trademarks §5A.01[5][c][ii] (emphasis added).  The answer to that question here is no.  *See Aero AG Hldgs., LLC v. Huggoes Fashion LLC*, 2022 U.S. Dist. LEXIS 119089, at *45-46 (S.D.N.Y., Jul. 5, 2022) ("The dilution provisions of the Lanham Act protect only marks that

---

[68] 15 U.S.C. § 1125(c)(1).
[69] 15 U.S.C. § 1125(c)(2)(A).
[70] Thus "distinctiveness" for purposes of section 43(c) is narrower than for purposes of section 43(a) of the Lanham Act. *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 549-50 n.6 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005); *Tcpip Hldg. Co. v. Haar Communs.*, 244 F.3d at 94-95; 2 Gilson on Trademarks § 5A.01[4][b].

have achieved a substantial degree of fame, and that are approaching household names.")
(internal quotation marks and citations omitted).

Accordingly, the Trustee's request for relief under section 43(c) of the Lanham Act
should be denied.

D. <u>Other New York Law Claims</u>.

(i) *Deceptive Business Practice*.  The Trustee's claim on the same facts under N.Y. Gen.
Bus. L. § 349 fails because to be liable for deceptive acts or practices under that provision, "the
gravamen of the complaint must be consumer injury or harm to the public interest." *Mayes v.
Summit Entm't Corp.*, 287 F. Supp. 3d 200, 208 (E.D.N.Y. 2018) (internal quotation marks and
citation omitted). "Courts routinely reject attempts to fashion Section 349 claims from garden
variety disputes between competitors. . . . Instead, there must be specific and substantial injury to
the public interest over and above ordinary trademark infringement." *A.V.E.L.A., Inc. v. The
Estate of Marilyn Monroe, LLC*, 2018 U.S. Dist. LEXIS 35536, at *26-27 (S.D.N.Y. Mar. 5,
2018) (internal quotation marks and citations omitted.). *See also BBK Tobacco & Foods, LLP v.
Galaxy VI Corp.*, 408 F. Supp. 3d at 524; *IGT v. High 5 Games, LLC*, 2019 U.S. Dist., LEXIS
55941, at *15-16 (S.D.N.Y. Mar. 29, 2019) (as a consumer protection statute, section 349
requires "consumer injury or harm to the public interest" or "conduct that has significant
ramifications for the public at large") (internal quotations and citations omitted); *Perfect Pearl
Co., Inc. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d at 543.

(ii) *Trademark Dilution and Injury to Business Reputation*. The Trustee's claim for
trademark dilution under N.Y. Gen. Bus. L. § 360-1 also fails.  "To establish a claim for dilution
under GBL Section 360-1, a plaintiff must show (1) that the trademark is truly distinctive or has
acquired secondary meaning, and (2) a likelihood of dilution either as a result of blurring or

tarnishment." *IGT v. High 5 Games, LLC*, 2019 U.S. Dist. LEXIS 55941, at *17 (internal

quotation marks and citation omitted). Unlike under section 43(c) of the Lanham Act, section

360-1 does not require the mark to be "famous," only that it be distinctive, either inherently or by

acquiring secondary meaning. *SMJ Grp., Inc. V. 417 Lafayette Rest. LLC*, 2006 U.S. Dist.

LEXIS 61645, at *8-9 (S.D.N.Y., Aug. 30, 2006). It must, however, be sufficiently strong to be

subject to "dilution," given that section 360-1, like section 43(c) of the Lanham Act, protects

marks even where the later user is not in competition with the plaintiff. Thus "[A] trademark's

distinctiveness 'in a limited geographical or commercial area does not endow it with a secondary

meaning for the public generally.'"). *Id*. at *10, *quoting Mead Data Central, Inc. v. Toyota

Motor Sales, U.S.A., Inc.*, 875 F.2d 126, 1031 (2d Cir. 1989), and concluding that showing

merely that a mark was recognized by customers of a restaurant, rather than by the public at

large, including those that do not frequent it, was insufficient to state a claim. *Id*. at *11-12.

(iii) *De Facto Merger/Mere Continuation*. New York recognizes the doctrine of de facto

merger, under which a separate corporation will become liable for the debts of another. "The

hallmarks of a de facto merger are the continuity of ownership; cessation of ordinary business

and dissolution of the predecessor as soon as possible; assumption by the successor of the

liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired

corporation; and continuity of management, personnel, physical location, assets, and general

business operation." *Bonanni v. Horizons Invs. Corp.*, 179 A.D.3d 995, 999, 118 N.Y.S.3d 137

(2d Dept. 2020) (internal quotations marks and citations omitted), *leave to appeal dismissed*, 35

N.Y.3d 1059 (2020). Not all of these factors must be shown. *Redmond v. Teledyne Landis

Mach.*, 2017 U.S. Dist. LEXIS 87026, at *25 (N.D.N.Y., June 7, 2017). However, "[I]n non-tort

actions 'continuity of ownership is the essence of a merger.'" *Washington Mut. Bank, F.A. v. SIB*

*Mtge. Corp.*, 21 A.D.3d 953, 954, 801 N.Y.S.2d 821 (2d Dept. 2005), *quoting Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 47 (2d Cir. 2003).[71] That factor is shown "where the parties to the transaction become owners together of what formerly belonged to each." *Redmond*, 2017 U.S. Dist. LEXIS 87026, at *26 (internal quotation marks and citations omitted).

Here, while the Trustee has established certain elements of the de facto merger doctrine, he has not shown the requisite continuity of ownership. While it could be argued that Ms. Schliman, one of the 50 percent owners of Gordos North, is a stand-in for her husband, who was the controlling shareholder of Gordos, Ms. Piazza, the other 50 percent owner, had no ownership interest in Gordos. Also, although the Trustee established that Gordos North continued to use several of Gordos' former vendors and employees, he did not establish that Gordos North paid Gordos' obligations to them. Nor, of course, is Gordos North located at Gordos' former location, and the trial record reflects that Mr. Piazza and his company invested substantial sums in building out Gordos North's new premises. The Trustee therefore has not established his de facto merger claim.

Although the Second Circuit has noted that "[s]ome courts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception" to the general rule of corporate separateness, *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d at 45 n.3, the "mere continuation" doctrine "is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of the reach of the predecessor's creditors." *Wilson v. Pasquale's Damarino's, Inc.*, 2019 U.S. Dist. LEXIS 163594, at *20 (S.D.N.Y., Sept. 23, 2019) (internal quotation marks and citations omitted). It, too, however, requires a common identity of directors and stockholders. *Id.*; *see also Redmond*

---

[71] The need to show continuity of ownership has been rejected in tort actions. *Lippens v. Winkler Backereitechnik Gmbh*, 138 A.D.3d 1507, 1509-10, 31 N.Y.S.3d 340 (4th Dept. 2016).

*v. Teledyne Landis Mach.*, 2017 U.S. Dist. LEXIS 87026, at *34; *Colon v. Multi-Pak Corp.*, 477

F. Supp. 2d 620, 627 (S.D.N.Y. 2007).  As discussed above, the Trustee has not shown this, or

that "it is not simply the business of the original corporation which continue[d], but the corporate

entity itself." *Martin Hilti Family v. Knoedler Gallery LLC*, 386 F. Supp. 3d 319, 351-52

(S.D.N.Y. 2019) (internal quotation marks and citation omitted).

      (iv) *Breach of Fiduciary Duty*. The Trustee has claimed that Mr. Schliman breached his

fiduciary duty to Gordos by permitting the transfer of its trade name and associated goodwill for

no value.

      To establish a breach of fiduciary duty under New York law, the movant must prove the

existence of a fiduciary duty, a knowing breach of that duty, and resulting damages.  *Spinelli v.*

*Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018); *McSpedon v. Levine*, 158 A.D.3d 618,

621, 72 N.Y.S.3d 97 (2d Dept. 2018) ("[T]o establish a breach of fiduciary duty, a plaintiff must

prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that

were directly caused by the defendant's misconduct").  Under New York law, Mr. Schliman,

Gordos' president and controlling shareholder owed a fiduciary duty of undivided and undiluted

loyalty to Gordos' interest holders and, upon Gordos' becoming insolvent, which it was by the

time it filed its chapter 11 case, to the corporation "to preserve corporate assets for the benefit of

the creditors."  *United States SBA v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y. 2018)

(internal quotation marks and citation omitted); *see also Official Committee of Unsecured*

*Creditors v. Sabine Oil & Gas Corp* (*In re Sabine Oil & Gas Corp.*) 562 B.R. 211, 230

(S.D.N.Y. 2016) (under New York law, fiduciaries of an insolvent company owe duties to the

creditors, derivative of those owed to the corporation, to "exercise judgment in an informed,

good faith effort to maximize the corporation's long-term wealth creating capacity") (internal

quotation marks and citation omitted).  That duty of loyalty barred "not only blatant self-dealing, but also require[ed] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989) (internal quotation marks and citation omitted); *Morgan Art Found. Ltd. v. Brannan*, 2020 U.S. Dist. LEXIS 14043, at *63 (S.D.N.Y. Jan. 28, 2020).[72]

Here, the Court has found that Mr. Schliman knew, at least around the time that Gordos North was incorporated with the intention of becoming a restaurant in Mr. Pleasant, that it meant to appropriate Gordos' trade name and associated goodwill.  Nevertheless, while he was still Gordos' president and controlling shareholder he did not try to make Gordos North pay for those assets. Instead, he stayed silent and let the trade name and goodwill be taken, acting in his self-interest with the knowledge that his wife owned 50 percent of Gordos North and that it would employ him.

As noted above, however, he is liable for this conduct only if it directly caused damages to Gordos and its creditors.  *Morgan Art. Found.*, 2020 U.S. Dist. LEXIS 14043, at *66. Because he ceased being a fiduciary on April 3, 2019, the date that the Court entered the order converting Gordos' chapter 11 case to one under chapter 7[73] and the Trustee was appointed,[74] the damages would only be those caused by his conduct from on or around February 21, 2019, the date of Gordos North's incorporation, to April 3. That conduct was his failure to demand that Gordos North pay for Gordos' trade name and to act to prevent it from doing so by taking steps

---

[72] While Gordos was a debtor in possession under the Bankruptcy Code, that duty continued. *Commodity Futures Trading Com. v. Weintraub*, 471 U.S. 343, 355-56 (1985) (officers and managing employees of debtor in possession have the fiduciary responsibilities of a trustee); *see also Advanced Contr. Sols., LLC v. Metallic Lathers & Reinforcing Ironworkers Local 46* (*In re Advanced Contr. Sols., LLC*), 582 B.R. 285, 304 (Bankr. S.D.N.Y. 2018) (same; "[a]s fiduciaries, the debtor-in-possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property") (internal citations omitted).

[73] Main case Dkt. No. 30.

[74] Id. No. 31.

in this Court to stop it, which the Trustee later undertook by demanding compensation and by starting the present adversary proceeding. Damages directly caused by Mr. Schliman's failure at least to disclose Gordos North's plan, a fact that he uniquely had the duty and power to make public even if his wife and her business partner would have refused a demand to cease and desist and pay, are thus the costs to the Debtor's estate arising from the delay in the Trustee's learning of Gordos North's actions: New York statutory prejudgment interest, *see In re FKF 3 LLC*, 2018 U.S. Dist. LEXIS 183087, at \*47-48 (S.D.N.Y., Oct. 24, 2018), and, arguably, the Trustee's additional attorneys fees and costs caused by the delay. *Croce v. Kurnit*, 565 F. Supp. 884, 895 (S.D.N.Y. 1982). The Trustee has not quantified either of these amounts, but he will have leave to do so by filing and serving a pleading in support thereof within 30 days after the entry of a judgement consistent with this Memorandum of Decision.

E. <u>Remedies</u>.

(i) *Under Section 550 of the Bankruptcy Code*. Subject to exceptions not applicable here, section 550 of the Bankruptcy Code provides the remedy for an avoided transfer, including one avoided under section 549 of the Bankruptcy Code, as follows: "[T]o the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made."[75]

Gordos North was the initial transferee of the avoided transfer of Gordos' trade name and associated goodwill and still holds it, and therefore section 550(a) applies to it. The Trustee has contended, moreover, that the remedy also applies to Gordos North's shareholders, Ms. Schliman and Ms. Piazza, subject to a single satisfaction,[76] on the basis that the transfer was made for their

---

[75] 11 U.S.C. § 550(a).
[76] 11 U.S.C. § 550(d).

benefit. The Trustee has not cited any authority, however, for the proposition that a corporate transferee's shareholders are, because of that status, liable under section 550(a)(1) as persons "for whose benefit such transfer was made." Nor has he established that the corporate veil between Gordos North and its shareholders should be pierced or that, separate and apart from their status as shareholders, they benefitted. Under the circumstances, therefore, only Gordos North is subject to section 550(a)(1).

"In order to establish liability for a transferee for whose benefit the transfer was made, the benefit must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred. Incidental, unquantifiable, or remote allegations of benefit are not sufficient." *Gowan v. Amaranth LLC* (*In re Dreier LLP*), 452 B.R. 451, 466 (S.D.N.Y. 2011) (internal quotations marks and citations omitted). The quintessential example of such an entity is a guarantor of the debt whose liability is relieved because the transfer satisfies the obligation of the primary obligor. *Id.* Reliance solely on the shareholders' status as such, without additional evidence of the transfer's direct benefit to them thus is insufficient. *Deitz v. Spangenberg*, 2013 U.S. Dist. LEXIS 123601, at *51-52 (D. Minn., Aug. 29, 2013); *Holber v. Pocius* (*In re Pocius*), 556 B.R. 658, 672-73 (Bankr. E.D. Pa. 2016) (corporate veil not pierced; fact that defendant was manager and had 80 percent control of transferee insufficient); *In re Brown Publ. Co.*, 2015 Bankr. LEXIS 667, at *26-27 (Bankr. E.D.N.Y. Mar. 4, 2014); *Peterson v. Hofmann* (*In re Delta Phones, Inc.*), 2005 Bankr. LEXIS 2550, at *16-17 (Bankr. N.D. Ill, Dec. 23, 2005) ("That a shareholder holds some ownership interest in a corporation does not somehow mean that all transfers made to the corporation . . . are automatically made for the 'benefit' of the shareholder under section 550(a)(1)."); *Turner v. Phoenix Fin., LLC* (*In re Imageset, Inc.*), 299 B.R. 709, 718 (Bankr. D. Me. 2003) (shareholders

not liable *qua* shareholders; "[t]he benefit must derive directly from the transfer, not from the use to which it is put by the transferee").[77]

To be distinguished from the foregoing cases and the facts here are *Von Gunten v. Neilson* (*In re Slatkin*), 243 Fed. Appx. 255, 257 (9th Cir. 2007) (sole shareholder, director, and officer of Ponzi scheme corporation was liable under section 550(a)(1) where, in addition, there was evidence he directed the use of the funds received by the corporation); *Geltzer v. Salzman* (*In re Continuityx, Inc.*), 582 B.R. 124, 137 (Bankr. S.D.N.Y. 2018) (complaint asserts claim under section 550(a)(1) against sole officer and shareholder of transferee where, in addition to such status, he wrote checks from the transferee's account to himself to distribute proceeds of the transfers); *Official Comm. of Unsecured Creditors v. Fountainhead Grp., Inc.* (*In re Bridgeview Aerosol, LLC*), 538 B.R. 477, 513 (Bankr. N.D. Ill. 2015) (sole shareholder liable under section 550(a)(1) where corporate transferee was a shell, its only real assets being the avoided transfers to it).

The Bankruptcy Code "provides no guidelines to aid the bankruptcy court in deciding when to permit recovery of the value of the property [under section 550(a)(1)] rather than the property itself," 5 Collier on Bankruptcy ¶ 550.02[3], leaving the determination to the Court's discretion. *Jones v. Brand Law Firm, P.A.* (*In re Belmonte*), 931 F.3d 147, 152 (2d Cir. 2019). "The factors which the Court should consider in determining whether to order turnover of the property rather than payment of the value include whether the value of the property (1) is contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation," *Hirsch v. Gersten*, (*In re Centennial Textiles*), 220 B.R. 165, 177 (Bankr. S.D.N.Y. 1998), the purpose of the statute being "to restore the estate to the financial condition it

---

[77] One can also be liable under section 550(a)(2) as an "immediate or mediate transferee" of an initial transferee", 11 U.S.C. § 550(a)(2), but the Trustee has not attempted such a showing.

would have enjoyed if the transfer had not occurred." *Id*. At the risk of stating the obvious, section 550(a) does not require the plaintiff seeking recovery of the transferred property instead of its value to satisfy the factors for obtaining an injunction, such as irreparable injury, balance of harms, and that public policy favors the relief.

In keeping with the restorative purpose of the statute, post-transfer decline in value would normally lead one to require payment of transfer-date value instead of turnover. *Id*. *See also* 5 <u>Collier on Bankruptcy</u> ¶ 550.02[3][a]. Post-transfer appreciation in value might also lead one to require payment of value as of the date of the recovery, subject, however, to deductions for value added in good faith; or value as of the date of the avoided transfer, without deductions; or, alternatively, recovery of the property, depending on the facts, such as whether there was a danger either the plaintiff or the defendant might otherwise receive a windfall. *Weinman v. Fid. Capital Appreciation Fund* (*In re Integra Realty Res., Inc.*), 354 F.3d 1246, 1266-67 (10th Cir. 2004); *In re Classic Drywall, Inc.*, 127 B.R. 874, 876-77 (D. Kan. 1991); *In re Atlas Computers, Inc.*, 2012 Bankr. LEXIS 3374, at *27-36 (Bankr. N.D. Ok., Jul. 24, 2012), *aff'd* 2014 U.S. Dist. LEXIS 40011 (N.D. Ok., Mar. 26, 2014); 5 <u>Collier on Bankruptcy</u> ¶ 550.02[3][a]. Here, however, no meaningful evidence was presented regarding how the value of the asset has changed over the more than three years since Gordos North took Gordos' trade name and goodwill. Nor has Gordos North shown that it was a good faith transferee that itself added specific value to Gordos' trade name and thus would have a right to a lien on the trade name to the extent of such added value under section 550(e)(1)(a) of the Bankruptcy Code.[78]

---

[78] 11 U.S.C. § 550(e)(1)(a). There was evidence that Ms. Schliman's husband contributed significant value to Gordos North to fund its buildout and initial supplies, but he is not even a shareholder of Gordos North, and Gordos North, as will be discussed in more detail below, has no obligation to repay him. To be clear, Gordos North did not even raise section 550(e)(1)(a).

The Trustee offered the following evidence of the value of Gordos' trade name and goodwill on the date of the transfer: (1) the $560,00 purchase price under the 2006 Share Purchase Agreement, a material although unspecified component of which, as discussed above, the Court reasonably infers was attributable to Gordos' trade name and associated goodwill, and (2) Gordos North's gross sales adjusted for taxes from its start of business through January 2022, subject to any showing by Gordos North of corresponding operating expenses during that period, which the Trustee chiefly submitted to support his claim for a remedy under 15 U.S.C. § 1117(a) for violation of section 43(a) of the Lanham Act. A similar measure has in fact also been used in the section 550 context pertaining to the appropriation of a business. *West v. Hsu* (*In re Advanced Modular Power Sys.*), 413 B.R. at 678-79 (court applies gross sales less cost of good sold (i.e. gross profits) as a valuation starting point, further deducting certain expenses reported on transferee's tax returns). As discussed below, the Trustee is in fact entitled to recovery in the form of an accounting and disgorgement from Gordos North based on Gordos North's adjusted gross sales subject to a reasonable adjustment for imputed reasonable expenses. He cannot, however, have more than one satisfaction,[79] just as the Court does not have the discretion to order that neither the property nor its value be recovered under section 550(a). 5 Collier on Bankruptcy ¶ 550.02[3].

Given the considerable overlap of section 550(a)'s "value" analysis with the Trustee's Lanham Act recovery analysis, as well as the lack of evidence regarding depreciation or appreciation of Gordos' trade name and goodwill post-transfer, the Court will direct the turnover of the trade name and associated goodwill to the Trustee under section 550(a).[80] This remedy is

---

[79] 11 U.S.C. § 550(d).
[80] Directing turnover as the remedy under section 550(a) of the Bankruptcy Code also obviates any concern that the Trustee's monetary remedy for Gordos North's Lanham Action violation should not be available by analogy in the section 550(a) context. *See Anderson v. Bennett-Smith* (*In re Bennett*), 2021 Bankr. LEXIS 381, at *9-10 (Bankr.

subject however to there being only one satisfaction from Gordos North for its appropriation of the trade name and goodwill: if the Trustee recovers in full on his claim under section 43(a) of the Lanham Act, therefore, Gordos North will not also have to turn over the "Gordo's" name to the Trustee under section 550(a) of the Bankruptcy Code.

(ii) *Remedies Under the Lanham Act*.  "[A]n injunction, profits, damages, including enhanced damages, and attorneys' fees in exceptional cases, are available in appropriate circumstances to a Section 43(a) plaintiff who does not own a trademark registration" but has an unregistered trademark or trade name entitled to protection.  1 Gilson on Trademarks § 1.04[d][i][D][VI].  The Trustee has requested both injunctive relief under section 34 of the Lanham Act[81] and monetary relief, including enhanced damages and attorneys' fees, under section 35 of the Lanham Act.[82]

(A) Injunction Not Warranted.  Under section 34(a) of the Lanham Act, the Court has the "power to grant injunctions, according to the principles of equity, and upon such terms as the court may deem reasonable, . . . to prevent a violation under subsection (a) . . . of section 43.  A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction."[83]

Notwithstanding that the Trustee has established Gordos North's liability under section 43(a) of the Lanham Act, and therefore is accorded a rebuttable presumption of irreparable harm, he is not, however, left with an inadequate remedy at law, a critical element of the right to an

---

M.D.N.C., Feb. 19, 2021) (insufficient evidence of post-transfer appreciation or depreciation, or "evidence that sufficiently and precisely establishes the value of the Property for purposes of entering judgment.  Therefore, the Court will award recovery of the property.").

[81] 15 U.S.C. § 1116.
[82] 15 U.S.C. § 1117.
[83] 15 U.S.C. § 1116(a).

injunction "according to the "principles of equity" as provided in section 34(a). *BSP Agency LLC v. Katzoff* (*In re KG Winddown, LLC*), 632 B.R. 448, 484-85 (Bankr. S.D.N.Y. 2021). He has his recovery remedy under section 550(a) of the Bankruptcy Code and, subject, again, to a single satisfaction, he can establish, as discussed below, a monetary remedy under section 35(a) of the Lanham Act. This is especially apt given that Gordos no longer is in business and thus is not subject to reputational damage, the fundamentally "irreparable" type of harm that section 34(a) seeks to protect against. *Id.* at 484-85.

(B) <u>Right to a Monetary Remedy</u>. Under section 35(a) of the Lanham Act, in relevant part, when "a violation under section 43(a) . . . shall have been established in any civil action under this Act, the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . The court in exceptional cases may award reasonable attorneys fees to the prevailing party."[84] *See also Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d at 80 n.1.

Section 35(a) further provides that "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."[85] The section also sets forth the burden of proof with respect to the first stated remedy, recovery of the defendant's profits, as follows: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."[86]

---

[84] 15 U.S.C. § 1117(a).
[85] *Id.*
[86] *Id.*

The Trustee has shown that the estate was damaged by Gordos North's appropriation of Gordos' trade name and goodwill without compensation, but he has not established the amount of the estate's actual damages by showing Gordos' lost profits or a reasonable royalty.[87]

In such circumstances, section 35(a) nevertheless provides a separate remedy, the accounting for and disgorgement of Gordos' North's profits based on a showing of its gross sales related to the infringement, *Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 474 (8th Cir. 2011), *cert. denied*, 131 S. Ct. 2920 (2011); *Int'l Star Class Yacht Racing Ass'n v. Hilfinger*, 80 F.3d 749, 753 (2d Cir. 1996); *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988); 4 Gilson on Trademarks § 14.03[3][a] ("Even if actual damages are not available to the plaintiff, the court may still grant plaintiff an accounting of defendant's profits."),[88] subject to (a) Gordos North's ability to establish all elements of costs or deductions from such sales to establish its profits, and (b) "principles of equity" and the avoidance of any unduly "inadequate or excessive" award, as expressly referenced in the statute. *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 214 (2d Cir. 2019); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 875-76 (5th Cir. 2019); 4 Gilson on Trademarks § 14.03[6].

---

[87] Actual damages can be established by a showing of plaintiff's lost profits and any other proximately caused injury from the infringement, which need not be done with "absolute exactness," but at least must be shown with a reasonable basis for the computation. 4 Gilson on Trademarks § 14.03[3][a]. *See also PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987) ("Although the quantum of damages . . . must be demonstrated with specificity, courts may engage in some degree of speculation in computing the amount of damages, particularly where the inability to compute them is attributable to the defendant's wrongdoing.") (internal quotation marks and citations omitted); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002) (lost profits established by estimating revenue lost due to the infringing conduct, minus what it would have cost to generate that revenue). A plaintiff's damages can also be shown by establishing a reasonable royalty, 4 Gilson on Trademarks § 14.03[3][d], which, however, the Trustee has not attempted.

[88] Courts, have, however, awarded both plaintiff's damages -- although generally not lost sales -- and defendant's profits. 4 Gilson on Trademarks § 14.03[6][a] ("The successful plaintiff is ordinarily put to an election of remedies between [plaintiff's lost sales and the infringer's profits] because recovery of both would be an inappropriate double recovery, inasmuch as a recovery of the infringer's profits in all likelihood will compensate for the sales the plaintiff has lost."). *But see*, *River Light V, L.P. v. Lin & J Int'l, Inc.* 2015 U.S. Dist. LEXIS 82940, at *17-22 (S.D.N.Y. June 25, 2015) (awarding both disgorgement and lost profits, trebled).

42

That the Trustee has not shown the estate's damages by establishing a reasonable royalty or Gordos' lost profits does not preclude him, moreover, from seeking a judgment for any sum of up to three times the amount found as actual damages "according to the circumstances of the case," as provided in section 35(a) of the Lanham Act. *RVC Floor Décor, Ltd. v. Floor & Décor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 331 (S.D.N.Y. 2021); *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 257 F. Supp. 3d 611, 623 (S.D.N.Y. 2017), *aff'd in relevant part*, 933 F.2d 202, 217 (2d Cir. 2019). *Cf.* 4 Gilson on Trademarks § 14.03[6][d] (as an award of the infringer's profits is not an award of damages, it cannot be trebled from the amount proved, but the court can enhance or reduce an inadequate or excessive award of profits "as the court shall find to be just").

Based on the plain language of section 35(a), courts have considerable discretion in determining the appropriate remedy, *see, e.g.*, *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d at 214-15; *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 (11th Cir. 1983); 4 Gilson on Trademarks § 14.03[2] ("Against the statutory background there is broad judicial discretion to award or withhold monetary relief according to the equities and circumstances of the case. The trial court is accorded great latitude in awarding damages, and the reviewing court will not set aside an award unless it is clearly inappropriate or inadequate.").

When considering whether to apply an accounting and profits disgorgement, courts should balance the equities, including the following factors, although others might be relevant and not necessarily all factors must be established: "(1) the degree of certainty that the defendant benefitted from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) the delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." *4 Pillar Dynasty LLC*, 933 F.3d at 214; *see also*

43

*Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d at 876 (listing similar factors as well as the public interest in making the misconduct unprofitable). In the Second Circuit, establishing that the defendant's infringement was willful, defined as a showing "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness," *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 Fed. Appx. 26, 31 (2d Cir. 2013), nevertheless was long an absolute requirement. The Supreme Court has clarified, however, that "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate. But acknowledging that much is a far cry from insisting on the inflexible precondition" of a finding of willfulness. *Romag Fasteners, Inc. v. Fossil Grp., Inc.*, 140 S. Ct. 1492, 1497 (2020).

Weighing such factors, a monetary award based on disgorgement of Gordos North's profits is appropriate here. First, Gordos North clearly benefited from its appropriation of Gordos' trade name and goodwill, including by getting a running start with its opening. It did this purposefully, linking itself to Gordos. The Court also found the Schlimans' testimony that they did not understand Gordos' trade name to be valuable and protected not to be credible in the light of, among other things, Mr. Schliman's testimony that he understood the Share Purchase Agreement gave Gordos the continued right to use the name "Gordo's" and Ms. Schliman's contrived testimony that Gordos North was named after the Spanish word for "fat". The Trustee therefore has established that the appropriation was willful. There was no showing that the Trustee unduly delayed seeking relief, and the only unclean hands on Gordos' side were the Schlimans', who are of course conflicted, with Mr. Schliman found to have breached his fiduciary duty. Finally, as discussed above, other Lanham Act remedies are difficult to quantify

44

or inferior; in the bankruptcy context, the best evidence of value often is a market test, but Gordos North's taking of the trade name and goodwill precluded that.

Based on Gordos North's operating reports, which, as discussed above, the Court found reliable, Gordos North had adjusted gross sales (after sales and withholding taxes) of $2,057,151,75 from its opening in mid-September 2019 through January 2022.[89] Gordos North did not dispute this sum.[90] Gordos North has continued to use Gordos' trade name after January 2022, but the Trustee provided no evidence of its sales thereafter, and, moreover, it can reasonably be inferred that the benefit from the continued use of Gordos' trade name and goodwill has waned from the very real benefit that existed when Gordos North opened for business. Therefore, the Trustee has established the starting point of the Lanham Act accounting and disgorgement of profits analysis:  $2,057,151.

Ultimately under section 35(a) of the Lanham Act, a defendant's profits subject to disgorgement are determined by "deducting [from gross sales the] costs incurred and attributable to the design, manufacture, and sale of the accused products." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d, 207, 234 (S.D.N.Y. 2012).  That could have been a relatively easy exercise here because of the largely overlapping nature of the two restaurants. This is not a case where one must materially differentiate between the specific costs associated with an infringing product and the costs associated with the defendant's sale of other products. *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 7 (2d Cir. 1989) (deductions from gross sales by infringing party limited to those attributable to its unlawful use of the infringed property); *River*

---

[89] Ex. J (monthly operating reports, minus December 2019 report); Ex. U (summary, admitted without objection, of monthly operating reports, including December 2019 report omitted from Ex. J).

[90] It did introduce New York sales tax filings for the period at issue, Ex. 9, but it did not offer any supporting documentation or explain the basis for any difference between these statements of adjusted gross sales and the operating reports that were generated from Gordos North's point-of-sale system.  The Court has discounted them. *See Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *7-8 (E.D.N.Y. Sept. 12, 2007).

*Light V , L.P. v. Lin & J Intl'l, Inc*, 2015 U.S. Dist. LEXIS 82940, at *20; only those costs that were separate from continuing or enhancing the value of Gordos' goodwill that Gordos North appropriated, such as overhead, would not be deducted.

As noted above, however, under section 35(a), Gordos North had the burden of establishing each element of any deductions from its sales with respect to its associated costs. *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 Fed. Appx. at 32; *Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990) ("This sequence of proof thus places the burden of proving costs on the party with the superior access to such information, namely the infringing defendant."); *E. Mishan & Sons, Inc. v. Novel Brands LLC*, 2020 U.S. Dist. LEXIS 28109, at *12 (S.D.N.Y. Feb. 13, 2020) ("The Court need not account for deductions from Defendant's profits that Defendant does not prove."), *adopted*, 2022 U.S. Dist. LEXIS 24377 (S.D.N.Y., Feb. 10, 2022); *Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *11-12 ("Accordingly, where an infringing party does not provide information from which net profit can be reliably determined, it is permissible to award the highest reasonably ascertainable amount of profits.") (internal quotation marks and citation omitted).  Where this burden shifting has a harsh result leading to a windfall disproportionate to defendant's actions, under the statute the court may decrease the profits award as the court shall find to be just. 4 Gilson on Trademarks § 14.03[6][d], citing plain text of section 35(a).  It is also recognized, however, that Congress intended "all the inconvenience and loss from the confusion [be] thrown upon the party who produces it; and this rule applies, even though the innocent victim's share in the property wrongfully and inextricably commingled may apparently be a small part of the total."  *Id.* (internal quotation marks and citations omitted).  *See also Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 177-178 (3d Cir. 2005), citing *Mishawaka Rubber & Woolen Mfg. Co. v.*

46

*S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942); *WMS Gaming, Inc. v. WPC Prods. Ltd.*, 542 F.3d

601, 608-09 (7th Cir. 2008); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d at 1538-39.

Here, Gordos North offered three types of evidence to show its deductible costs.[91]  The

first comprised (a) two pages of handwritten notes listing various expenses allegedly paid by it

between July 19, 2019 and September 15, 2019, which were never tied, however, by testimony

or other documents to any invoices or checks, as well as a post-it reference that can be inferred

as a payment *to* Gordos North by Mr. Piazza; (b) a $45 September 2019 receipt apparently from

an employment agency, and (c) a Gordos North check dated June 12, 2019 to a payee named

Daltile,[92] which one can infer was for a portion of the restaurant's buildout. The evidentiary

weight of the check is greatly weakened by Mr. Piazza's testimony that he or his company paid

for most of the buildout, however, and, again, there are no receipts, checks, or even invoices

beyond September 2019. All in all, with the exception of the $45 receipt, this evidence does not

support any deductions from the adjusted gross sales figure established by the Trustee.  *Bambu

Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) (self-serving testimony and

"smattering of bills" without "documents routinely used to prove expenses (e.g. cancelled

checks)" insufficient to prove deductible costs); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d at 176

(district court properly rejected summary of expenses lacking corroboration).

Gordos North's second type of evidentiary support for its costs is equally unavailing. It

consists of copies of invoices, checks, and other documents (some more reliable than others)

regarding amounts that Mr. Piazza testified he or his construction business, Piazza Brothers, Inc.,

---

[91] In addition, when asked by Gordos North's counsel, who offered Ms. Schliman as his witness, "Do you know if Gordos North has ever been profitable," Ms. Schliman answered, "No. It has not." There is no documentary or other evidentiary basis for this statement, however, and, given Ms. Schliman's lack of credibility, I have discounted it. *Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d at 1064 (court relied on financial data showing defendant's profits-to-sales ratio, not self-serving testimony of defendant's principal).  Gordos North offered no evidence of its profit margin or a profits-to-sales ratio.
[92] Ex. 7, pages 1-2, 4-5.

advanced directly or indirectly to Gordos North for its buildout, equipment, and miscellaneous supplies.[93] Most of these payments appear to have been for the buildout. However, based on Mr. Piazza's testimony and the lack of any documentary evidence to the contrary, neither Mr. nor Piazza Brothers, Inc., were creditors of Gordos North. The amounts advanced were not documented in the form of loans or any other contract between Gordos North and Mr. Piazza or his company, and there was no expectation of repayment unless, based on Mr. Piazza's understanding of Gordos North's financial condition, it was able to pay him.[94] These amounts, to the extent quantified, therefore would not properly be viewed as Gordos North's costs. (It is not clear that they would even be capital contributions instead of gifts, because Mr. Piazza, unlike his wife, was not a shareholder of Gordos North; nevertheless, as discussed in more detail below, Gordos North has since paid him at least "a few hundred thousand" of what he advanced.)[95]

The last evidence of allegedly deductible costs offered by Gordos North were its federal and state income tax returns for October 1, 2018 through September 30, 2019 and for the same fiscal year for 2020 and 2021.[96] (No tax returns were provided for October 2021 through January 2022 to correspond to the Trustee's evidence of adjusted gross sales through January 2022.)

The case law often discounts such evidence, at least to the extent that tax returns do not sufficiently differentiate between the types of expenses that should be deducted from the gross sales attributable to infringement from the defendant's other expenses, and, in addition, where "the assertions in the tax returns are so vague and unspecified that the Court cannot properly rely

---

[93] Exs. 1 (page 3 and 6 and thereafter) and 2. Trial Tr. at 72-77 (testimony of John Piazza).
[94] Trial Tr., at 73 ("I might have had a conversation with myself telling myself when Gordos North makes money, I'll pay myself back. . . . My wife would tell me when she was able to -- myself, you know, obviously, yeah.").
[95] Id., at 75.
[96] Ex. 8.

upon them as a fair representation of [defendant's] costs." *Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *10-11. *See also La Bamba Licensing, LLC. v. LA Bamba Authentic Mexican Cuisine, Inc.*, 2022 U.S Dist. LEXIS 126180, at *16-23 (W.D. KY, Mar. 31, 2022); *Am. Rena Int'l v. Sis-Joyce Int'l Co.*, 2016 U.S. Dist. LEXIS 179981, at *7-12 (C.D. Cal., Dec. 29, 2016); *Ptak Bros. Jewelry, Inc. v. Ptak*, 2009 U.S. Dist. LEXIS 50299, at *7-8 (S.D.N.Y., June 1, 2009) (declining to deduct legal and professional expenses and "other expenses" listed on tax return, "as these are not identified with any specificity").

Here, Gordos North's federal tax return for October 2018 - September 2019 lists its "Costs of Goods Sold" as $26,243, itemized as "Purchases" ($65,108) and "Other Costs" ($4,251) described on the cross-referenced IRS Statement 5 as "Supplies," which are reduced by "Inventory at End of Year" ($43,116). There is no itemization of any of these listings and no other evidence in the trial record supporting them. This federal tax return further shows Officers' Compensation as $3,000, itemized as $1,500 each for the two shareholders; "Salaries and Wages" ($27,036); "Rent" ($21,940); "Repairs and Maintenance" ($13,243"); "Taxes and Licenses" ($14,224), with no breakdown between taxes, which were deducted in the Trustee's adjusted gross income calculation, and licenses; and "Advertising" ($4,722). There is no breakdown of the "salaries and wages" and "repairs and maintenance" items and no indication of the monthly rent. We thus do not know how much of the salaries and rent were for the pre-opening period. Moreover, the evidence reflects that Mr. Piazza or his business advanced Gordos North's buildout costs and substantially all its costs for supplies, including food and drink, at least for the beginning period. Further, as noted, there is no evidence to support treating those advances as debt of Gordos North, indeed as more than a gift by a generous husband to his wife. "Other Deductions" for October 2018 - September 2019 are listed in IRS Form 1120 as

aggregating $38,041. However, $15,700 of such sum comprises expenses for accounting, legal and other professionals without further detail, as well as $4,055 for insurance expenses for a tax year during which Gordos North was open for only two weeks and other overhead items.

The Court cannot reasonably deduct most of these costs as being associated with Gordos North's support and enhancement of the value of Gordos' trade name and goodwill, either because they did not directly contribute to it, such as the professional fees, overhead, and Ms. Piazza's compensation,[97] or because they are not substantiated in sufficient detail or are contradicted by other evidence. *Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *12-15. From Gordos North's $74,837.38 adjusted (after tax) gross sales, therefore, Gordos North has sustained its burden of proof with respect to deductions of $16,595, comprising Ms. Piazza's compensation ($1,500), advertising ($4,722), event expenses ($4,575), credit card commissions ($47), payroll processing ($133), and the point-of-sale system ($5,618), leaving a net profit for the restaurant's opening two weeks of $58,242.83.

Gordos North's federal tax returns for fiscal years 2020 and 2021 raise similar issues in that they list "Cost of Goods Sold" consisting of "Purchases" and "Other Costs"/"Supplies" and "Repairs and Maintenance" without itemization or any other evidentiary support in the record and in the face of testimony reflecting that Mr. Piazza paid a significant portion of these amounts. They also include taxes that were deducted in the Trustee's adjusted gross sales calculation, and they include significant items of overhead and unspecified legal and other professional fees.

---

[97] There is no evidence that Ms. Piazza, unlike Ms. Schliman, worked at the restaurant. *See Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *16-18 (noting divergent authority on whether infringing employees' salaries should be deducted but deducting officers' salaries for work necessary to generate profits from which plaintiff shall benefit).

For October 2019 - September 2020, properly deductible amounts listed in Gordos North's federal tax return consist of officer compensation ($44,500), which excludes Ms. Piazza's compensation for the reason stated above; salaries and wages ($329,574); rents ($122,396); licenses ($1,362); advertising ($17,492); and "Other Expenses" appearing on IRS Form 1120 comprising credit card commissions ($13,950), point-of-sale system ($7,422), event expenses ($9,049), and payroll processing ($4,410).  This aggregate sum is reduced, however, by a $192,800 forgivable PPP loan not included in the Trustee's adjusted gross sales calculation, for a total deduction of $357,355.

For October 2020 - September 2021, properly deductible amounts listed on Gordos North's federal tax return consist of officer compensation ($52,000), again excluding Ms. Piazza (although it appears that she did not receive any compensation during this period); salaries and wages ($220,178); rents ($124,183); license ($2,962); advertising ($37,483); and "Other Expenses" appearing on IRS Form 1120 comprising event expenses ($58,306), although the Court is skeptical about the size of this sum; credit card commissions ($4,119); and payroll processing ($5,453).  It should be noted that this tax return also reflects that Gordos North (a) received a $465,373 RRF Grant during this period, which was not included in the Trustee's adjusted gross profits calculation or deducted on the tax return, and (b) during the same period it paid $400,000 to Mr. Piazza's company, Piazza Brothers, Inc..  As discussed, however, there is no evidence that Piazza Brothers, Inc.. should be viewed as a creditor of Gordos North (or even of the reasonably exact amount of money that it, instead of Mr. Piazza, contributed to Gordos North in connection with the restaurant's buildout, maintenance, and repairs).[98]  Without

---

[98] This tax return also lists $2,105 of interest expense, but there is no evidence of any interest-bearing debt.

crediting against such aggregate deduction the amount of the RRF Grant, properly deductible expenses for October 2020 - September 2021 therefore equal $504,684.

Aggregate properly deductible expenses for September 15, 2019 through September 2021 therefore aggregate $878,634.  As noted, Gordos North has not offered any evidence of its costs for October 2021 through January 2022, when the period in which the Trustee has submitted evidence of Gordos Norths adjusted gross sales ends.  Again, for the entire period September 15, 2019 through January 2022, the Trustee established adjusted gross sales of $2,057,151.75. Based on the following calculations, therefore, Gordos North's net profits for purposes of the disgorgement/accounting remedy under section 35(a) of the Lanham Act would be $1,178,517.75.

Notwithstanding Gordos North's failure to support additional meaningful deductions from the Trustee's adjusted gross sales amount (and the many courts that have stopped at this point in the analysis), the equitable nature of section 35(a)'s disgorgement remedy should here, however, be further considered.  While the principal factor in applying that remedy is the defendant's intent, and the Court has found Gordos North to have willfully infringed, other factors, as discussed above, should also be considered, not only as to whether the disgorgement remedy should be applied at all (as the Court has found) but also as to the amount of the disgorgement. These include whether the plaintiff and the infringer are in competition (not here) and whether the amount of profits to be disgorged is, in the words of the statute, "either inadequate or excessive," in which case the Court can enter judgment for an amount it deems "just."  4 Gilson on Trademarks § 14.03[6][c], [d].  *See also Estate of Bishop v. Equinox Int'l Corp.*, 256 F.3d 1050, 1056 (10th Cir. 2001); *Choice Hotels Int'l, Inc. v. Zeal, LLC*, 2016 U.S. Dist. LEXIS 99342, at *21-22 (D. S.C. Jul. 29, 2016) (profits award reduced by 50 percent to

make it "more likely that Plaintiff recovers Defendants' profit margin, rather than gross revenue"); *River Light V, L.P. v. Line & J Int'l Inc.*, 2015 U.S. Dist. LEXIS 82940, at *21-22; *Ptak Bros. Jewelry, Inc. v. Ptak*, 2009 U.S. Dist. LEXIS 50299, at *5-9 (further reducing award by 30 percent); *Sethness-Greenleaf, Inc. v. Green River Corp.*, 1995 U.S. Dist. LEXIS 13796, at *11-12 (N.D. Ill., Sept. 20, 1995) (although entire gross profits could be awarded under section 35(a), such a result would be punitive here, "as there is no doubt that the usual costs were incurred selling the counterfeit [product].").

Although Gordos North has not carried its burden of proof to show its deductible costs from its adjusted gross profits except as set forth above, it clearly incurred similar costs to generate its adjusted gross sales for October 2021 through January 2022.  Further, there is no doubt that at least a portion of the $781,191 of the "costs of goods sold" listed on its federal tax returns for September 2019 through September 2021 and the "rents" and "salaries" for October 2018 through September 2019, which the Court has not heretofore counted for the reasons stated above, was paid by Gordos North and not Mr. Piazza or his business and directly contributed to the value of its gross sales. This does not mean that the Court believes Gordos North took no value from its appropriation of Gordos' trade name and associated goodwill during the period in question, or, as Gordos North has contended, that its tax returns establish that it could not have done so because they reflect a net loss for tax purposes for the covered periods.  Among other things, Gordos North had the wherewithal to pay Mr. Piazza's company at least the $400,000 reflected on the most recent tax return, for what was either a gift or a capital contribution[99] and

---

[99] Contrast *Lincoln Diagnostics, Inc. v. Panatrex, Inc.*, 2009 U.S. Dist. LEXIS 84904, at *34-37 (C.D. Ill., Sept. 16, 2009) (no profits disgorgement/accounting awarded where tax returns showed annual losses, no benefit shown from violation of Lanham Act, and neither defendant's principal nor any of his family members received any money from the defendant in the past ten years).

as he acknowledged in his trial testimony.  The Court therefore finds and determines that the

final equitable measure of the Trustee's disgorgement/accounting remedy is $250,000.

C. <u>Enhancement</u>.  As noted above, section 35(a) of the Lanham Act authorizes the Court

to enter judgment

> according to the circumstances of the case, for any sum above the amount found
> as actual damages, not exceeding three times such amount.  If the court shall find
> that the amount of the recovery based on profits is either inadequate or excessive
> the court may in its discretion enter judgment for such sum as the court shall find
> to be just, according to the circumstances of the case.  Such sum in either of the
> above circumstances shall constitute compensation and not a penalty.[100]

Here, the Court has determined that the award of Gordos North's net profits, as further

adjusted as set forth above, is adequate compensation for its infringement.  Therefore,

although Gordos North acted willfully, further enhancing the award would be punitive,

especially given the Trustee's right to the alternative relief of turnover under section

550(a) of the Bankruptcy Code if he believes such sum to be insufficient.  *Int'l*

*Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *19-20; *see*

*also* 4 <u>Gilson on Trademarks</u> § 14.03[3][c].

D. <u>Attorneys Fees, Prejudgment Interest and Costs</u>.  Section 35(a) of the Lanham

Act allows prevailing plaintiffs to recover "the costs of the action" and, "in exceptional

cases," reasonable attorneys fees.[101]  Interpreting an identical statutory provision, the

Supreme Court has held that an "exceptional case" for such purpose "is simply one that

stands out from others with respect to the substantive strength of a party's litigating

position (considering the governing law and the facts of the case) or the unreasonable

manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness,*

---

[100] 15 U.S.C. § 1117(a).
[101] 15 U.S.C. § 1117(a).

*Inc.*, 572 U.S. 545, 554 (2014); *see also Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 531 (2d Cir. 2018) (applying *Octane Fitness* standard to section 35(a) of the Lanham Act).  The determination is to be made on a case-by-case basis in the exercise of the trial court's discretion considering the totality of the circumstances, *Octane Fitness*, 572 U.S. at 554, and the trial court has "wide latitude" in making it. *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933 F.3d at 215.  Factors to consider, in addition to the willfulness of the infringement, which neither is necessary for a fee award nor mandates it, *id*. at 216, include the "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.*, quoting *Octane Fitness*, 572 U.S. at 554 n.6.

"As to an award of prejudgment interest, our case law draws no distinction between the showing required to support such an award and that required to justify an award of attorney's fees. *Id*. at 216.

Here, there were no exceptional circumstances, such as discovery failures or undue delay, or other unreasonable behavior in how Gordos North litigated this case. The Court has found that its infringement was willful and at Gordos and its creditors' expense (although not malicious).  Further, Gordos North forced the Trustee to litigate when the facts establishing its liability were fairly apparent.  On the other hand, only a portion of the Trustee's claims were under the Lanham Act, and because he has not prevailed on his trade dilution claims he would be entitled to recover, if at all, only in respect for the work done on his claim under section 43(a) of the Lanham Act.  *See Sleepy's LLC*, 909 F.3d at 531.  Further, Gordos North's defenses were not frivolous, in

that they were premised neither on clearly baseless factual contentions (other than Ms.

Schliman's assertion that the name was chosen based on the Spanish word for "fat") nor

clearly meritless legal theories, and they led to a trial, not summary judgment.

*Greenberg v. Perfect Body Image, LLC*, 2020 U.S. Dist. LEXIS 194596, at *4, *6-7

(E.D.N.Y. Oct. 20, 2020), *aff'd* 2022 U.S. App. LEXIS 2775 (2d Cir., Jan. 31, 2022).

The Court also concludes that the remedies granted to the Trustee are sufficient to

compensate the estate and deter similar misconduct. Thus under the circumstances, this

was not an "exceptional" Lanham Act case warranting the imposition of attorneys' fees

and prejudgment interest.

### Conclusion

For the foregoing reasons, the Trustee shall have judgment against Gordos North

as follows:  (a) under section 549 of the Bankruptcy Code for the unauthorized transfer of

Gordos' trade name and associated goodwill, the avoidance of such transfer, and (b) for

breach of Section 43(a) of the Lanham Act for its infringement of Gordos' trade name

and associated goodwill.  The remedy for the foregoing shall be in the alternative.  For

Gordos North's violation of section 549 of the Bankruptcy Code, under section 550(a) of

the Bankruptcy Code, Gordos North shall promptly (and in any event no later than 14

days after the entry of such judgment) cease using the word "Gordos" in its name and in

any communications with or to the public.  Alternatively, for Gordos North's violation of

section 43(a) of the Lanham Act, Gordos North shall promptly (and in any event no later

than 14 days after the entry of such judgment) account/disgorge under section 35(a) of

the Lanham Act to the Trustee for the benefit of the Debtor's estate Gordos North's net

profits related to such infringement in the sum of $250,000, plus the Trustee's costs, with post-judgment interest at the federal rate under 28 U.S.C. § 1961.

The Trustee shall have judgment against Michael Schliman for his breach of fiduciary duty, in an amount to be determined as set forth herein upon a submission to be made by the Trustee to the Court, on notice to Mr. Schliman, no later than thirty days after the entry of this Memorandum of Decision.[102]

The Trustee's claims against Lisa Schliman and Joanne Piazza are denied with prejudice.

The Trustee shall promptly email a proposed judgment to this Court's chambers, copying respective counsel for Gordos North and Ms. Piazza, as well as the Schlimans, that is consistent with the foregoing.

Dated:  White Plains, New York
      August 4, 2022                              */s/ Robert D. Drain*
                                         United States Bankruptcy Judge

---

[102] In addition to filing such submission on the docket of this adversary proceeding, the Trustee shall email it to Hon. Sean Lane's chambers, with a copy to Mr. Schliman, as Judge Lane will be presiding over all post-judgment aspects of this adversary proceeding in the light of my retirement.